[No. 46124.   En Banc.   July 24, 1980.]

FEDERATED PUBLICATIONS, INC., *Petitioner*, v. J. S. KURTZ, ET AL, *Respondents.*

*Beaty & Childress,* by *Robert E. Beaty* (*Robert C. Bernius* and *Nixon, Hargrave, Devans & Doyle,* of counsel), for petitioner.

*Slade Gorton, Attorney General,* and *Kevin M. Ryan, Assistant,* for respondents.

*P. Cameron DeVore* and *Stephen C. Sieberson* on behalf of Allied Daily Newspapers, *George R. Nock, James E. Beaver,* and *Gene R. Moses,* amici curiae.

WILLIAMS, J.—This case presents the question of whether a trial court properly barred the press and public from a pretrial suppression hearing. We hold that it did.

The stipulated facts giving rise to this action against a state officer are as follows:

On November 1, 1978, the State of Washington charged Jo Elliott Tharp with the crime of murder in the second degree, alleging that on March 30, 1978, Tharp had murdered William Ray Bond.

From April 1, 1978, through March 23, 1979, petitioner Federated Publications, Inc., a Delaware corporation doing business in Whatcom County as the Bellingham Herald, published 16 newspaper articles concerning the Bond homicide and the Tharp prosecution. During this same period of time, the Whatcom County Sheriff's Department and the Bellingham Police Department issued an unspecified number of news releases concerning the Tharp case. The above events were also covered during these months by

seven radio and television stations which operate in What-com County.

Based on the notoriety given the case, defendant Tharp's attorney moved for a change of venue, which was granted by Judge Jack Kurtz on January 24, 1979. The trial was set for April 2, 1979, in the Superior Court for Skagit County. The Bellingham Herald has a weekly circulation of 939 households and a Sunday circulation of 1,251 in Skagit County, where the estimated 1978 population was 63,000 people.

On March 16, 1979, a suppression hearing was held in State v. Tharp before Judge Kurtz in Whatcom County Superior Court. Among those present was a news reporter from the Herald. The hearing had several purposes: (1) to determine pursuant to CrR 3.5 the admissibility of certain statements made by the defendant; (2) to rule on defendant's motion to suppress evidence of his prior convictions; and (3) to rule on a defense motion to suppress circumstantial evidence which tended to link defendant Tharp's involvement in two prior car thefts with the Bond homicide.

After the CrR 3.5 hearing, the defense attorney and the prosecuting attorney jointly moved the court to order the remainder of the suppression hearing closed. After a short discussion between counsel, the court, and the news reporter, Judge Kurtz ordered the courtroom closed and the file sealed.

On April 2, 1979, a jury panel was convened in Skagit County Superior Court with Judge Kurtz presiding. Thereafter, petitioner filed in this court a petition against a state officer in the nature of prohibition or declaratory judgment pursuant to RAP 16.2(b), naming as respondents Judge Kurtz, defendant Tharp, defense counsel Philip Sharpe, and Whatcom County Prosecuting Attorney David S. McEachran. The petition sought an order (1) vacating the order of closure, (2) opening the court file, including the transcript of the suppression hearing in State v. Tharp, and

(3) permanently enjoining Judge Kurtz "from committing future violations of the type complained of".

On April 9, 1979, Judge Kurtz signed an order opening the suppression and confession hearing file. The record does not disclose the result of the Tharp prosecution.

An amended petition filed April 12, 1979, sought in addition a declaratory judgment that the closure order violated petitioner's rights under the Washington Constitution.

All respondents moved to dismiss the petition. On June 26, 1979, this court issued an order which granted motions to dismiss respondents Tharp, Sharpe, and McEachran and denied a motion to dismiss respondent Kurtz, who remains the sole respondent in this action.

## I

We note at the outset that this case is at least technically moot. The suppression hearing has long since been completed, so that granting petitioner's prayer for vacation of the closure order would be pointless. Moreover, the request that this court order the sealed file opened and a verbatim transcript supplied cannot be granted, since respondent ordered that relief on April 9, 1979.

We have agreed, however, to review otherwise moot cases "if matters of continuing and substantial interest are involved." *In re Patterson*, 90 Wn.2d 144, 148, 579 P.2d 1335 (1978). Specifically, if a case presents a question of a public nature which is likely to recur, and if an authoritative determination now is desirable for the guidance of public officials, we shall not refuse to decide it on its merits. *In re Patterson; Hartman v. State Game Comm'n*, 85 Wn.2d 176, 532 P.2d 614 (1975). It is apparent that the present case meets these requirements.

## II

Were we to resolve this question under the United States Constitution, we would be bound by the recent decision in *Gannett Co. v. DePasquale*, 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979), a case procedurally and factually indistinguishable from the present case in all important

respects. The court there emphasized its earlier holdings which accord a heavy weight to a criminal defendant's rights to a fair trial under the Sixth Amendment:

This Court has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial. *E. g., Sheppard* v. *Maxwell,* 384 U. S. 333 [16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966)]; *Irvin* v. *Dowd,* 366 U. S. 717 [6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961)]; *Marshall* v. *United States,* 360 U. S. 310 [3 L. Ed. 2d 1250, 79 S. Ct. 1171 (1959)]. Cf. *Estes* v. *Texas,* 381 U. S. 532 [14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965)]. To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. *Sheppard* v. *Maxwell, supra.* And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.

*DePasquale,* at 378.

Among the kinds of pretrial publicity posing a threat to a fair trial, the court stated, is publicity concerning pretrial suppression hearings:

Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. Cf. *Jackson* v. *Denno,* 378 U. S. 368 [12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A.L.R.3d 1205 (1964)]. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized during a pretrial proceeding, however, it may never

be altogether kept from potential jurors. *Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun.* Cf. *Rideau* v. *Louisiana,* 373 U. S. 723 [10 L. Ed. 2d 663, 83 S. Ct. 1417 (1963)].

(Footnotes omitted. Italics ours.) *DePasquale,* at 378–79.

While the court recognized, at the least, a "strong societal interest" in open judicial proceedings, *DePasquale,* at 383, it concluded that society's interest in the case was outweighed by the reasonable probability of prejudice to the defendants. *DePasquale,* at 393. Scrutinizing all the circumstances, including the trial court's granting of petitioner's motion to be heard on the closure issue, the court held that press and public had no affirmative constitutional right of access to a pretrial proceeding where a defendant's fair trial rights were threatened. *DePasquale,* at 394.[1] Since we perceive no important factual differences between *DePasquale* and the present case, we are compelled to conclude that respondent's closure order and order temporarily sealing the file did not violate the United States Constitution.

### III

We prefer, however, to resolve the present case under our own state constitution. This we do for several reasons. Most important is the significant textual difference, discussed below, between the Washington and United States constitutions in the matter of open judicial proceedings.

Secondly, the *DePasquale* opinion, while authoritative as to the content of the Sixth Amendment right to a fair and impartial jury, is not clear on the source of the asserted public interest in free and open access to judicial

---

[1]Four dissenters concluded that the circumstances which would permit closure did not exist in this case. *DePasquale,* at 448 (Blackmun, J., concurring in part, dissenting in part).

proceedings.[2] The four dissenting justices in *DePasquale* found a public interest in access to suppression hearings grounded in the Sixth Amendment, a position specifically disclaimed by the majority. *DePasquale,* at 379, 434 (Blackmun, J., concurring in part, dissenting in part). Four members of the majority were of the view that, although there is an undeniable societal interest in public court proceedings arising from common law history and tradition, that interest does not rise to the level of a Sixth Amendment right. *DePasquale,* at 382–83, 391. Mr. Justice Powell, concurring in the majority, found a First Amendment right of public access to a pretrial suppression hearing, a question expressly reserved by the majority. *DePasquale,* at 393, 397 (Powell, J., concurring). Since the Washington Constitution provides more specific guidance on the matter of open proceedings, it simplifies our task.

■ Third, it is beyond question that the Supreme Court has recognized that state courts are the ultimate arbiters of state law, unless a state court's interpretation restricts the liberties guaranteed the entire citizenry under the federal constitution. *Cooper v. California,* 386 U.S. 58, 62, 17 L. Ed. 2d 730, 87 S. Ct. 788 (1967); *Jankovich v. Indiana Toll Road Comm'n,* 379 U.S. 487, 491–92, 13 L. Ed. 2d 439, 85 S. Ct. 493 (1965). *And see People v. Brisendine,* 13 Cal. 3d 528, 548, 531 P.2d 1099, 119 Cal. Rptr. 315 (1975). *See generally* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977). Such a disposition has the special advantage of finality, since it is not subject to review by the United States Supreme Court. *Herb v. Pitcairn,* 324 U.S. 117, 125–26, 89 L. Ed. 789, 65 S. Ct. 459 (1945); *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 80 L. Ed. 158, 56 S. Ct. 183 (1935). The decision may

---

[2]We do not distinguish between the interests of press and public in this matter. "[T]he right of the media to observe . . . judicial proceedings is not a special privilege but rather is equivalent to the right of the public in general to have open access to public trials." *Cohen v. Everett City Council,* 85 Wn.2d 385, 386–87, 535 P.2d 801 (1975); *Tribune Review Publishing Co. v. Thomas,* 254 F.2d 883, 884–85 (3d Cir. 1958).

therefore be confidently relied on by the lower Washington courts.

Three provisions of the Washington Constitution appear to aid us in developing pretrial closure order standards for the trial courts. The state equivalent to the First Amendment is Const. art. 1, § 5:

§ 5 FREEDOM OF SPEECH. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

The parties make no claim that this provision provides textual support for the view that the public has a right of access to all judicial proceedings. Nor is there case law in Washington which interprets section 5 as affording an absolute right in the public or press to attend all criminal proceedings. As we have observed, in the *DePasquale* case only Mr. Justice Powell concluded that the First Amendment supported such a right.

■ We have held that when a trial is a public event, section 5 confers a right on the press to publish information gathered there. *State ex rel. Superior Court v. Sperry,* 79 Wn.2d 69, 77, 483 P.2d 608 (1971). It is to be noted, however, that *Sperry* involved a trial in which the jury was already impaneled, not a pretrial hearing, as here. Moreover, the question in *Sperry* involved a "gag order" and prior restraint on publication of information already acquired by the press. *Cf. Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976); *Gannett Co. v. DePasquale,* 443 U.S. 368, 393 n.25, 61 L. Ed. 2d 608, 630, 99 S. Ct. 2898 (1979) (Powell, J., concurring at 398-99; Blackmun, J., concurring in part, dissenting in part at 411).

We agree with respondent that there is a substantial difference between the right to publish already acquired information and a right to attend a proceeding for the purpose of news gathering. While *Sperry* makes clear that section 5 protects the former activity, we decline to hold that it confers a right to the latter.

Const. art. 1, § 22, providing rights to an accused in a criminal prosecution, corresponds to U.S. Const. amend. 6, which provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

By contrast, Const. art. 1, § 22 provides, in relevant part:

> § 22 RIGHTS OF THE ACCUSED. In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases[.]

The parties agree that sections 5 and 22, although they are analogous to the federal provisions at issue in *DePasquale,* do not govern this case. This is so because the Washington Constitution contains a specific provision which addresses the question of public access to criminal proceedings:

> § 10 ADMINISTRATION OF JUSTICE. Justice in all cases shall be administered openly, and without unnecessary delay.

Const. art. 1, § 10.

■ Unlike section 22, this section provides a textual basis for recognizing a right of public access to court proceedings. We have given explicit recognition to the provision: "This separate, clear and specific provision entitles the public, and as noted above the press is part of that public, to openly administered justice." *Cohen v. Everett City Council,* 85 Wn.2d 385, 388, 535 P.2d 801 (1975).

Moreover, by its terms it is not limited to trials but includes all judicial proceedings.

On the other hand, it is undisputed that the public's right to open proceedings is not absolute. *Cohen,* at 388–89; *In re Lewis,* 51 Wn.2d 193, 198–200, 316 P.2d 907 (1957).[3] In some cases, the right of access to open proceedings may conflict with a criminal defendant's right to a fair trial under Const. art. 1, § 22. In such cases, closure may be the only way to protect those rights, as the Supreme Court found in the *DePasquale* case. What we must ultimately decide is whether the present circumstances were exceptional enough to justify closure. *Cohen,* at 388.

In attempting to resolve this question, we start with the premise that section 22 affords fair trial rights which at a minimum must provide to the accused the protection he or she enjoys under the Sixth Amendment. *See Sibron v. New York,* 392 U.S. 40, 60–61, 20 L. Ed. 2d 917, 88 S. Ct. 1889, 1912 (1968); *Brisendine,* at 548. In the area of free press and fair trial, the Supreme Court has described the Sixth Amendment rights of the accused as follows:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is *never* weighed against the accused.

(Italics ours.) *Sheppard v. Maxwell,* 384 U.S. 333, 362, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966). *Cf. DePasquale,* at 378–79.

---

[3]Indeed, amici in support of respondent's position contend that a literal interpretation of section 10 would wreak havoc with established judicial practices in that it would allow public access to all phases of the administration of justice, including chambers conferences, plea bargaining and settlement conferences, adoption proceedings, those juvenile proceedings presently closed, and appellate court conferences. Since we do not read section 10 in absolute terms, we need not address this argument.

Since section 22 must at a minimum provide that an accused have an "impartial jury free from outside influences" and that the balance is "never weighed against the accused," the public's right of access under section 10 must be interpreted in light of these requirements. *Sheppard,* at 362; *see State v. Bianchi,* 92 Wn.2d 91, 92, 593 P.2d 1330 (1979); *In re Lewis,* at 198–200; *Brisendine,* at 548. In order for a trial court to determine if a given case is one whose circumstances justify closure of a judicial proceeding, the court needs workable standards that allow it to strike a balance between the public's right of access and the accused's rights to a fair trial including an impartial jury.

Petitioner urges that a trial judge must forbid closure unless a defendant demonstrates that an open proceeding will lead to a "substantial probability" of "irreparable damage" to his right of fair trial. Moreover, it is argued that defendant should assume the burden of showing that all other alternatives will fail to protect his rights.

These standards appear to us to place too heavy a burden on the accused. While we have no trouble with instructing trial courts that closure must not be lightly imposed, the standards suggested have the fatal vice of proceeding from an apparent preference for the right of public access to judicial proceedings over the right of a defendant to a fair trial, in particular an impartial jury. Such a strict set of standards seems to presuppose a willingness to tolerate a substantial though not clearly demonstrable risk of impairment of the right to an impartial jury by placing the burden on the accused to show potential impairment. We are unwilling to tolerate such a risk. We are unaware of any precedent, state or federal, that places *on the accused* the burden of vindicating his fair trial rights.

The Supreme Court in *DePasquale* addressed the problem of requiring the accused to show "inescapable necessity". While discussing the due process rights of an accused, the court said:

[A] trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. *Sheppard* v. *Maxwell, supra.* And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures *even when they are not strictly and inescapably necessary.*

. . .

The danger of publicity concerning pretrial suppression hearings is particularly acute, because *it may be difficult to measure with any degree of certainty the effects of such publicity* on the fairness of the trial. . . . Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to *attempt to insure* that the fairness of a trial will not be jeopardized[.]

(Italics ours.) *DePasquale,* at 378–79. Since we likewise believe that Const. art 1, § 22 requires the trial judge to take protective measures against the reasonable possibility of prejudicial publicity, we cannot adopt petitioner's suggested standard.

Rather, some of the principles suggested by Mr. Justice Powell, concurring in *DePasquale,* seem to us to provide workable guidelines under the state constitution for balancing the competing interests in suppression hearing closure questions. These guidelines include:

1. The accused must make some showing of likelihood of jeopardy to his constitutional rights from an open proceeding. In the present case, the defense motion, joined in by the prosecution, clearly raised the issue.

2. Anyone present when the closure motion is made must be given an opportunity to object to the closure. The number of objections, however, and the time necessary to present them must be subject to the trial court's inherent power to control the proceedings. Moreover, the court should not be obliged to delay proceedings, since one of the purposes of pretrial proceedings is to expedite the entire matter and to give counsel adequate time to prepare for trial in light of the outcome of the suppression hearing. Here, no formal objection was made at the time of the

hearing, and the parties were reluctant to continue the hearing in light of the fact that the trial was just 2 1/2 weeks away.

3. The objector must demonstrate that there are available practical alternatives to closure which would protect defendant's rights. Petitioner suggests that one or more of the following alternatives might protect a defendant's rights: continuance, severance, change of venue, change of venire, voir dire, peremptory challenges, sequestration, and admonition of the jury.

While we agree that one or more of these alternatives may avoid prejudice in a particular case, we note that it cannot be assumed an alternative will be sufficiently protective. In the present case, there had already been a change of venue before the suppression hearing, but venue was moved only to neighboring Skagit County, where it was conceded the Herald was circulated.

While it is true that publication may not result in a particular case, the trial judge here found that the Herald had twice violated the Washington Bench–Bar–Press Guidelines after an express request from the court through the prosecutor not to publish ballistics evidence. *See* Bench–Bar–Press Statement of Principles and Guidelines for the Reporting of Criminal Proceedings (1966). Since the press is entitled to publish information gathered in open proceedings (*State ex rel. Superior Court v. Sperry*, 79 Wn.2d 69, 77, 483 P.2d 608 (1971)), the only assurance the trial court has that incriminating testimony from a suppression hearing will not be published is the hope that the press will abide by the Bench–Bar–Press Guidelines. The prior conduct of petitioner gave respondent reasonable grounds to believe that the Herald would not respect the guidelines.

Moreover, we observe that section 22 includes the right to a *speedy* trial *in the county in, which the offense is charged to have been committed*. There is no reason to suppose these rights do not stand on an equal footing with the right to an impartial jury. Continuance and change of venue may force an accused to choose from among these

three rights. Although such a choice may be either unavoidable or desired by the accused, the court has the power to protect all three rights. Exercise of this power may be preferable to forcing the choice on the accused. This is especially true in this case where the petitioner, in publishing the ballistics evidence, created the circumstances which made it necessary for defendant to move for a change of venue.

Finally, we note that sequestration of the jury would be futile as a means of assuring impartiality, as the evidence in question may have been made public before the jury was impaneled. Moreover, we question the efficacy of voir dire and admonition in some cases where the evidence is extremely sensational or incriminating. Peremptory challenges, as is well known, are limited in number. CrR 6.4(e) permits a maximum of 12 such challenges per side in a capital case.

4. The court must weigh the competing interests of the defendant and the public. In the present case, the court, in granting the closure motion, entered findings which detailed the prejudicial nature of the evidence sought to be suppressed, the prior publication of damaging ballistics evidence (which resulted in the change of venue), and the fact of Herald circulation in Skagit County. In their arguments in support of the closure motion, both the prosecuting attorney and defense counsel emphasized to the court their recognition of the need for public dissemination of information along with their fear that an impartial jury could not be found if the suppression hearing testimony were published. In our view, the trial judge gave due consideration to both sides before he made his ruling.

5. The order must be no broader in its application or duration than necessary to serve its purpose, which in this case was to protect the accused's right to a fair trial while preserving the public's right to open proceedings. We think the trial court fully complied with this requirement. The order of closure in no way prevented press and public from access to all the information elicited at the hearing. It

merely postponed by as few days as possible the availability of the testimony in order to guard against the reasonable possibility of jury prejudice. All information was made fully accessible just after opening statements in State v. Tharp.

In conclusion, we think the above standards afford trial courts a realistic opportunity to strike a balance between these two interests which are protected by our state constitution. We observe in addition that cases such as this one, involving a sensational homicide combined with extensive publicity, are relatively rare, and thus the need for closure of suppression hearings is an uncommon one. Finally, we believe it important to emphasize that our decision is limited to *pretrial* hearings. Closure of other aspects of the judicial process is an entirely separate matter on which we express no opinion at the present time.[4]

Since we conclude that the order of closure was proper, the petition is accordingly denied.

ROSELLINI, STAFFORD, BRACHTENBACH, HOROWITZ, and HICKS, JJ., concur.

UTTER, C.J. (concurring and dissenting)—As the majority explains, difficult line–drawing and careful adjustment of burdens of proof are necessary in order to resolve the inherent conflict between the public's constitutionally protected interest in open pretrial proceedings and the criminal defendant's constitutional right to a fair trial. Although agreeing with the majority's statement of the requisite procedures for determining the propriety of closure of a pretrial proceeding, I disagree with the majority in that I would find that Const. art. 1, § 10 necessitates a more rigorous standard for closure. However, I concur in the majority's result, for even under this elevated standard of review, closure was appropriate in the present case.

---

[4]We note that the United States Supreme Court has recently decided for the first time that a *trial* in a criminal case must be open to the public "[a]bsent an overriding interest articulated in findings, . . ." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980).

The guaranty of open judicial proceedings has been a fundamental part of Anglo–American jurisprudence since the common law. "[J]ustice cannot survive behind walls of silence", and the requirement of open proceedings "guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard v. Maxwell*, 384 U.S. 333, 349, 350, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966); *See Gannett Co. v. DePasquale*, 443 U.S. 368, 382–84, 61 L. Ed. 2d 608, 623–24, 99 S. Ct. 2898 (1979); *Gannett*, 443 U.S. at 411–33, 61 L. Ed. 2d at 641–55 (Blackmun, J., dissenting). *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 495, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975). As the majority explains, this crucial requirement of open proceedings has been afforded express protection under the constitution of this state. Const. art. 1, § 10 "entitles the public, and . . . the press [which] is part of that public, to openly administered justice." *Cohen v. Everett City Council,* 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Although the open proceedings requirement must not be administered in such a way as to infringe upon the criminal defendant's right to a fair trial, *Gannett*, 443 U.S. at 392–94, 61 L. Ed. 2d at 629–30, the judiciary must preserve the public right of access to proceedings to the maximum extent possible.

The majority resolves the balance between the rights of the public and the rights of the criminal defendant by adopting the standard for closure of pretrial proceedings suggested by Mr. Justice Powell in his concurring opinion in *Gannett Co. v. DePasquale, supra.* Under this standard, the defendant seeking closure must make some showing of "likelihood of jeopardy" to his constitutional rights from an open proceeding. Majority opinion at page 62. After hearing the arguments of the parties which are objecting to closure, the trial court "must weigh the competing interests of the defendant and the public." Majority opinion at page 64. Although the majority does not specify the ultimate standard of closure to be employed by the trial court in weighing the competing interests, it appears that the question for the

trial court is "whether a fair trial for the defendant is likely to be jeopardized by publicity, if members of the press and public are present and free to report prejudicial evidence that will not be presented to the jury." *Gannett,* 443 U.S. at 400, 61 L. Ed. 2d at 634 (Powell, J., concurring); see majority opinion at pages 62, 64.

The majority is certainly correct in stating that an overly strict closure standard imposes an unconstitutional burden upon the defendant's fair trial rights. However, the standard which has been adopted by the majority fails to give sufficient deference to the public's constitutionally protected interest in open proceedings. I believe that our constitutional mandate of public proceedings requires that closure at pretrial proceedings be predicated upon not just a "likelihood of jeopardy", but rather a "substantial probability" of jeopardy to the defendant's fair trial rights.

Such a standard of "substantial probability" of jeopardy would be administered with the procedures outlined by the majority. A criminal defendant seeking closure would make an initial showing of substantial probability of jeopardy to his or her fair trial rights if the pretrial proceeding is conducted in the presence of public and press. Such a showing would necessarily include an explanation of the lack of practicable alternatives to closure. The burden would then shift to any parties objecting to closure to demonstrate that less restrictive alternatives to closure would adequately guard against the harm to the defendant's right to a fair trial. Finally, the trial court would determine whether there is in fact a substantial probability of jeopardy to the defendant's fair trial rights if the proceeding is held in the presence of public and press, and whether closure is necessary in order to guard against this danger.

The evidence presented to the trial court in the present case is sufficient to demonstrate a "substantial probability" of jeopardy to the defendant's fair trial rights if the suppression hearing were conducted in the presence of public and press. The evidence to be suppressed was prejudicial in nature, and the defense and prosecuting attorney both

stated that an impartial jury could not be found if the suppression hearing testimony were publicized. The Bellingham Herald is circulated in the county in which the trial would be held, and the Herald had already violated both the Washington Bench–Bar–Press Guidelines and an express request of the trial judge, by publishing potentially prejudicial ballistics information in the case. Finally, the evidence presented to the trial court adequately demonstrated that other less restrictive alternatives such as change of venue and sequestration of the jury panel were not practicable, since the Herald was distributed in the county to which the trial proceedings had been moved, and the prejudicial information concerning the suppression hearing could be publicized before a trial jury would even be impaneled.

Thus, the trial judge properly ordered closure and, as the majority explains, the trial judge correctly fashioned the closure order in the least restrictive fashion. Accordingly, I conclude, although using a different standard than the majority, that the trial court's order of closure was proper.

DOLLIVER, J. (dissenting)—The majority and the concurrence begin with an erroneous premise: that constitutional rights conflict. They thus reach an erroneous result: that a balance can and should be struck. As long as the court has the view that the *constitutional right* of the public (which includes the press, *see Cohen v. Everett City Council,* 85 Wn.2d 385, 535 P.2d 801 (1975)) to the open administration of justice (Const. art. 1, § 10), and the *constitutional right* of an accused to a fair trial (Const. art. 1, § 22), must be accommodated by the individuals involved rather than guaranteed by the State, it will continue to reach the kind of result reached here. As in this case, the only argument will be on the standards for accommodation. But this premise is wrong. The constitutional rights of one person are not to be tested and accommodated against the constitutional rights of another; neither are these constitutional rights to be arranged in some hierarchy with one superior

to another. Constitutional rights are the separate rights of individuals—alone or collectively—against the State. Interests may conflict; rights do not. *See* Linde, *Fair Trials and Press Freedom—Two Rights Against the State,* 13 Willamette L.J. 211 (1977).

To allow the State through one of its branches—here the judiciary—to act as a coat holder while individuals fight to assert their constitutional rights—not against the State but against each other—is a perversion of the whole notion of constitutional protection for the individual.

The parties to the murder trial had no right against the press nor any right to have the State exclude the press from the suppression hearing. The accused has a constitutional right of a fair trial which may be asserted against the State, not merely an interest to be asserted against the press. The State has an obligation to provide a fair trial or none at all. It cannot meet its obligation to one by denying the constitutional rights of others.

> That is the no doubt unintended but insidious logic of a formula which speaks of conflicts between constitutional rights. It transforms the defendant's fair trial claim against the state into a claim against the media. It lets the state turn two constitutional limitations on its powers into a classic example of "let's you and him fight." It asks defendants and reporters to trade off their rights between themselves or let a court do it for them. But this is not constitutional law.

Linde, at 218.

I recognize the balancing test in free speech/free press cases has been used by this court and the United States Supreme Court. *State v. Northwest Passage, Inc.,* 90 Wn.2d 741, 585 P.2d 794 (1978). Nevertheless, I believe the court should reexamine its position, particularly since, as I have indicated, it is contrary to correct constitutional analysis.

We have found in the past that the phrase "administered openly" in article 1, section 10, does not mean that every aspect of the judicial process must be public. Absolute access and the open administration of justice are not the

same thing. While the right of the people to have justice administered openly may not be tampered with by the State, it is the function of the courts to determine when the open administration of justice requires public access. In *In re Lewis,* 51 Wn.2d 193, 316 P.2d 907 (1957), the court found no constitutional objection to excluding the public from a juvenile hearing. Furthermore, there are a number of circumstances cited by the majority in note 3 where the lack of public access is not found to be contrary to the open administration of justice. It is the proper responsibility of this court to make the determination of those circumstances when, for justice to be administered openly, public access is also required. *See, e.g., Gannett Co. v. DePasquale,* 443 U.S. 368, 388 n.19, 61 L. Ed. 2d 608, 626–27, 99 S. Ct. 2898 (1979).

In order to comport with the requirements of article 1, section 10, must a pretrial suppression hearing be open to the public? I believe the answer is yes. The suppression hearing is intimately connected with the events of the actual trial and to close these proceedings to the public, including the press, would be contrary to the spirit and intent of article 1, section 10. *See Gannett Co. v. DePasquale; supra,* 443 U.S. at 406, 436–37, 61 L. Ed. 2d at 638, 657 (Blackmun, J., dissenting).

This court has the responsibility and duty to assure that each defendant has a fair trial, but this must be done without denying to the public its right of access under article 1, section 10. Both of these goals can be met. In the case of widespread media coverage, it may be more difficult, more troublesome, very inconvenient, and certainly more expensive, but it can be done. *See, e.g., Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976).

Not only do I believe this approach has constitutional validity, it is also good public policy. In a democratic society, the final responsibility for assuring the system works lies not with the courts, but with the people. This is particularly true with reference to individual rights. While the

day–to–day duty to provide a fair trial rests with the courts, the fundamental protection lies with the people. Most specifically, it lies with that portion of the public which has it within its power to threaten the right of a fair trial: the press.

The notion of responsibility is not foreign to our constitution, *e.g.*, article 1, section 5, and article 31. Inherent in the idea of responsibility is the requirement that those who have rights, although they may regard them as absolute, will not assert those rights in such a way as to trespass on the rights of others. With respect to the case of free press/fair trial, this idea has been expressed in the Bench–Bar–Press Principles and Guidelines (see West's Washington Court Rules 1979, at page 843).

All the daily newspapers of the state, acting through Allied Daily Newspapers of Washington, have agreed to the Bench–Bar–Press Principles and Guidelines. This includes the Bellingham Herald. Nevertheless, the trial court found in the proceedings before us:

> That disclosure of information [in the suppression hearings] herein would affect the defendant's Sixth Amendment right to obtain a trial by fair and impartial jury.
> That the Bellingham Herald violated the Bench–Bar–Press Guidelines in this case twice before this hearing, including the express request not to publish.

Thus, Federated agreed to the guidelines, violated them with impunity, and now comes to this court for a negotiated settlement. It should be noted, however, that the reporter for the Bellingham Herald at the time she was excluded from the suppression hearing stated she "intend[ed] to stay within the Bench, Bar, Press guidelines."

While I am disturbed at the majority's false premises, I am even more alarmed at the attitude of the plaintiff who seems to accept closure if a defendant can demonstrate "that an open proceeding will lead to a 'substantial probability' of 'irreparable damage' to his right of fair trial." Majority opinion at page 61. I find it incredible for the

press to be negotiating its—and the public's—*constitutional right* of access. It is one thing to agree voluntarily to negotiate your action after the right is determined. *See, e.g.,* Bench–Bar–Press Principles and Guidelines, *supra* at 846. It is entirely different to urge the court to negotiate your rights by a constitutional balancing act.

Rather than bargain away the public's constitutional rights while ignoring the Bench–Bar–Press Guidelines, I would think the press might prefer a fearless assertion of the constitutional right of an open proceeding, plus an equally fearless concern for the constitutional right of a defendant to a fair trial. With this certainty of belief in its own constitutional rights might come a responsible concern for the constitutional rights of others so that the unedifying spectacle brought before the court in this matter could have been avoided.

While some would argue that to expect the press to act responsibly with regard to the fair trial rights of a defendant would be, to use the words of Samuel Johnson in another context, "The triumph of hope over experience", I believe otherwise. But for an occasional aberration, the record of press regard for fair trial rights has been good. Moreover, once the right of access is declared and guaranteed, the nexus for the responsible exercise of that right will be made clear. This would make less attractive the easy progression of a press violation of Sixth Amendment rights, an appeal to the courts, a judicial balancing act, and the predictable self–serving editorials complaining of court repression of a free press. If, because of irresponsible activities of the press the guaranty of a fair trial becomes inordinately expensive and burdensome, the people, who first adopted article 1, section 10, will have it within their power if they choose to change that provision. Thus, the responsibility for the ultimate "balancing" of rights will return to its original source: the people of this state, not the courts. With this understanding of the vitality of article 1, section 10, the necessity for a fair trial, the locus of responsibility,

and the possibility of corrective action, if needed, there is no need for judicial balancing.

I recognize that freedom is not easy and that the temptations for abuse are great. This is both the glory and danger of self–government. Freedom cannot be guaranteed by the courts or any other aspect of government. It can be guaranteed only by those who have it: in this instance a free press. *See* L. Hand, *The Spirit of Liberty* 189 (3d ed. 1960). The *voluntary* accommodation of constitutional rights was responsibly made by the Bench–Bar–Press Principles and Guidelines. I refuse to join as this court, responding to what I trust was an isolated instance of ignoring these guidelines by the Bellingham Herald, judicially negotiates away the constitutional right of the people for justice to be administered openly.

I dissent.

WRIGHT, J., concurs with DOLLIVER, J.