IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31050-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BENITO GOMEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

BROWN, J.—Today, we reverse Benito Gomez's convictions for second degree

murder and six separate first degree assaults because the trial court, while sincerely

concerned about courtroom safety, nevertheless failed to provide a public trial when it

closed entry into the courtroom after court sessions began. We reject Mr. Gomez's

evidence sufficiency challenge. Accordingly, we reverse and remand for a new trial

without reaching Mr. Gomez's other error claims.

FACTS

On May 17, 2011, Mr. Gomez joined his fellow 18th Street gang members,

Michael Mercado, Alberto Ramirez, and Andres Solis, in an alley brawl with 13th Street

gang members, Julio Martinez, Miguel Saucedo, and Joseph de Jesus. Jessica Glasby

and David Cloyd lounged on the porch of a nearby apartment building, while Patricia

Nelson and Roberto Cuevas slept in a first floor room. Mr. Gomez shot and killed Mr. Martinez. Ms. Glasby, Mr. Cloyd, Mr. de Jesus, and Mr. Saucedo ran into the apartment building, through the hallway, and up the stairs to the second floor while Mr. Gomez shot at them, firing at least two bullets through the hallway. The first bullet penetrated the door to the room at the end of the hallway and lodged in clothing near the bed where Ms. Nelson and Mr. Cuevas had slept. The second bullet lodged in the doorframe of the room at the beginning of the hallway.

The State charged Mr. Gomez with one count of first degree murder and six counts of first degree assault, alleging he committed each crime while armed with a firearm. At trial, the court denied his change of venue motion and addressed his concerns about various security measures, stating,

> This is a public courthouse. Everyone in the public is entitled to appear in this courthouse for appropriate matters . . . and in fact the courtroom is rather full today of spectators concerning this particular case.
> . . . .
> . . . There are allegations that this incident was as a result of a rival gang confrontation. And the history of that type of activity, not only in this state, in this county and in this city is that there are often violent incidents that arise out of that type of situation.
> And so for those reasons, the Court has been proactive in . . . attempting to protect the people . . . involved in this case from any potential harm.
> . . . .
> . . . [T]here are other matters going on in the other courtroom . . . , which is just down the hallway from . . . the third floor of the courthouse . . . . And because there are other members of the public involved in those activities, it's incumbent upon this Court . . . to make sure that there is not somebody who is interested in somehow influencing the outcome of this case or interfering with the outcome of this case feigning an excuse to be in courthouse, going to that other courtroom without appropriate business there and then somehow assimilating themselves to the people involved in this particular activity without the security staff knowing that because they

2

at the threshold of coming up to the third floor that was not identified and then presenting a problem for us.

So the Court has considered all of these things and has made an appropriate decision concerning what security would be used here. There's no difference in security for this trial than any other trial . . . . We continue to have rules of procedure where people have to be on time for proceedings here. *We do not allow people to come into the courtroom after the court is in session* for not only security reasons but as well as the distraction that that causes when people come in.

. . . [W]hen a jury is impaneled in a case such as this, it doesn't make any difference what type of case it might be, but when people come into the courtroom after the matter is in session, they stop listening to the attorneys or to the witness who is testifying and they immediately direct their attention to the person that is coming in the door. And even though that person may be very innocent in coming in late, that distracts from the proceeding. And you run the potential that whatever is being said or addressed by the testimony, by the questions, by the Court's instructions is not going to be heard by the jury or members of that jury. And again, that then leads to problems and distractions and the orderly processing of that case.

Report of Proceedings (RP) at 150-54 (emphasis added). The court made this ruling without first addressing the public trial factors enunciated in *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).

Mr. Mercado and Mr. Ramirez identified Mr. Gomez as the shooter while neighbors testified they saw Mr. Gomez present at the crime scene. The jury found Mr. Gomez guilty of one count of second degree murder as a lesser included offense and six counts of first degree assault as charged, all while armed with a firearm. The court sentenced Mr. Gomez to serve nearly 115 years confinement. He appealed.

3

ANALYSIS

A. Public Trial

The issue is whether the trial court violated Mr. Gomez's public trial right by declaring "[w]e do not allow people to come into the courtroom after the court is in session." RP at 153. He contends the trial court did not weigh the *Bone-Club* factors on the record before closing the trial proceedings to the public. He may raise this error claim for the first time on appeal. *See* RAP 2.5(a)(3); *State v. Marsh*, 126 Wash. 142, 146, 217 P. 705 (1923); *see also State v. Wise*, 176 Wn.2d 1, 9, 16-18 & nn.10-11, 288 P.3d 1113 (2012); *State v. Paumier*, 176 Wn.2d 29, 36-37, 288 P.3d 1126 (2012). We review alleged public trial violations de novo. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

Both the federal and state constitutions provide a criminal defendant the right to a public trial. U.S. CONST. amend. VI; CONST. art. I, § 22. But in *Bone-Club*, our Supreme Court held a trial court may close trial proceedings to the public after weighing five factors on the record:

> 1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure and the public.
> 5. The order must be no broader in its application or duration than necessary to serve its purpose.

4

128 Wn.2d at 258-59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)) (citing *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36-39, 640 P.2d 716 (1982); *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 62-65, 615 P.2d 440 (1980)); *see also Waller v. Georgia*, 467 U.S. 39, 48, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984). If a trial court does not weigh the *Bone-Club* factors on the record before closing trial proceedings to the public, we must reverse and remand for a new trial because the error is structural, presumptively prejudicial, and never harmless. *Wise*, 176 Wn.2d at 14-19; *Paumier*, 176 Wn.2d at 35-37.

Trial proceedings are closed to the public "when the courtroom is completely and purposefully closed to spectators so that no one may enter and no one may leave." *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011); *accord State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). "[O]nce the plain language of the trial court's ruling imposes a closure," this court strongly presumes the trial proceedings were indeed closed to the public. *Brightman*, 155 Wn.2d at 516, 517 (citing *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 813-14, 100 P.3d 291 (2004)). Thus, to show a public trial violation occurred, the defendant need not prove the ruling was carried out. *Id* at 516. Rather, to show no public trial violation occurred, the State must overcome this presumption by proving the ruling was not carried out. *Id*.

Here, the plain language of the trial court's ruling, "[w]e do not allow people to come into the courtroom after the court is in session," completely and purposefully prohibits the public from entering the courtroom after trial proceedings begin. RP at 153. Therefore, we strongly presume the trial proceedings were closed to tardy

5

spectators. The State does not attempt to overcome this presumption by proving the ruling was not carried out. While generally arguing other parts of the trial were open, the State does not deny the trial proceedings were closed to tardy spectators.

The State unpersuasively stresses the trial court's ruling was a security measure ensuring courtroom safety. *See, e.g., State v. Hartzog,* 96 Wn.2d 383, 400-01, 635 P.2d 694 (1981); *State v. Turner,* 143 Wn.2d 715, 725, 23 P.3d 499 (2001); *State v. Damon,* 144 Wn.2d 686, 691, 25 P.3d 418 (2001); *State v. Jaime,* 168 Wn.2d 857, 865, 233 P.3d 554 (2010). Additionally, the State unpersuasively argues the trial court's ruling was a decorum protocol ensuring courtroom order. *See, e.g., People v. Colon,* 71 N.Y.2d 410, 416-17, 521 N.E.2d 1075, 526 N.Y.S.2d 932 (1988) (quoting *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581 n.18, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)); *McCrae v. State,* 908 So.2d 1095, 1096-97 (Fla. Dist. Ct. App. 2005); *Spencer v. Commonwealth,* 240 Va. 78, 86-87, 393 S.E.2d 609 (1990); *Davidson v. State,* 591 So. 2d 901, 902-03 (Ala. Crim. App. 1991); *State v. Williams,* 742 S.W.2d 616, 621 (Mo. Ct. App. 1987). Considering the constitutional importance of a public trial, tardiness is a minor annoyance.

In sum, because the trial court did not weigh the *Bone-Club* factors on the record before closing the trial proceedings to the public, we must reverse and remand for a new trial. Considering our analysis, we decline to address Mr. Gomez's remaining contentions, except for his evidence sufficiency challenge.

6

## B. Evidence Sufficiency

The issue is whether sufficient evidence supports Mr. Gomez's convictions for first degree assault of Ms. Glasby, Mr. Cloyd, Mr. de Jesus, and Mr. Cuevas. First, Mr. Gomez contends the State did not prove attempted battery because it did not show the bullets he shot into the apartment building had the apparent present ability to injure these victims. Second, he contends the State did not prove common law assault because it did not show the bullets he shot into the apartment building caused these victims to reasonably fear injury.

The State must prove all essential elements of a charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). And, the State cannot try a criminal defendant a second time if it failed to muster sufficient evidence the first time. *Burks v. United States*, 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). Evidence is sufficient to support a guilty finding if "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). An evidence sufficiency challenge "admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the jury's assessment of witness credibility and evidence weight. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

7

A person is guilty of first degree assault if, "with intent to inflict great bodily harm,"[1] he or she "[a]ssaults another with a firearm." RCW 9A.36.011(1)(a). Assault has three common law definitions: "actual battery," "attempted battery," and "common law assault." *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994) (quoting *State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993), *abrogated on other grounds by State v. Smith*, 159 Wn.2d 778, 786-87, 154 P.3d 873 (2007) (establishing sufficient evidence need not support all three of these definitions because they are not alternative means but "means within a means")); *see* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 35.50 & cmt. at 547-50 (3d ed. 2008). Our focus is not actual battery, but attempted battery and common law assault.

Attempted battery is "an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented." CP at 191; RP at 597; *accord* WPIC 35.50 & cmt. at 547, 549; *see Howell v. Winters*, 58 Wash. 436, 438, 108 P. 1077 (1910) (quoting THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS 278-

---

[1] Intent is "the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). Great bodily harm is "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(c). "[O]nce the intent to inflict great bodily harm is established, usually by proving that the defendant intended to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim [of the actus reus]." *State v. Elmi*, 166 Wn.2d 209, 218, 207 P.3d 439 (2009); *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994). Actus reus is "[t]he wrongful deed that comprises the physical component of a crime and that generally must be coupled with *mens rea* to establish criminal liability; a forbidden act." BLACK'S LAW DICTIONARY 41 (9th ed. 2009). Mens rea is "[t]he state of mind that the prosecution,

81 (3d ed. 1906)); *State v. Shaffer*, 120 Wash. 345, 349, 207 P. 229 (1922). Common law assault is "an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury." CP at 191; RP at 598; *accord* WPIC 35.50 & cmt. at 547, 549-50; *see State v. Frazier*, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972) (quoting *United States v. Rizzo*, 409 F.2d 400, 403 (7th Cir. 1969)); *State v. Byrd*, 125 Wn.2d 707, 712-13, 887 P.2d 396 (1995).

Ms. Glasby testified she was the first to run up the stairs, followed immediately by Mr. Cloyd. She heard Mr. Gomez fire several shots at the group during their ascent. The bullets flew past the group and splintered wood at the bottom of the stairs. The group thought Mr. Gomez was following the group up the stairs to shoot more bullets at them. Mr. Cloyd recounted he was the last to run up the stairs. When he was at the bottom of the stairs, about three or four strides up, he heard Mr. Gomez fire several shots at the group through the hallway. The bullets sounded like they were coming from outside the apartment building and hitting the walls and the bottom of the stairs. Mr. Cloyd later recounted he had already reached the top of the 15 to 20 steps when Mr. Gomez fired these shots. The group was scared they would have to violently confront Mr. Gomez at the top of the stairs.

Mr. de Jesus testified he was the last to run up the stairs, where he found Ms. Glasby and Mr. Cloyd. Mr. Saucedo followed but stopped at the bottom of the stairs,

---

to secure a conviction, must prove that a defendant had when committing a crime;

9

flattened himself against the wall, and shut the door leading into the stairs. Mr. Saucedo recounted he initially ran down the alley along with Mr. Martinez, who Mr. Gomez shot as they fled. Mr. Saucedo then stopped on the porch to survey the incident. When Mr. Gomez came into view, he fired two shots at Mr. Saucedo that came right in his face. Mr. Saucedo stepped backward into the door leading into the stairs and waited several seconds. Mr. Gomez left.

Ms. Nelson testified she was sleeping in bed with Mr. Cuevas when she awoke to the sound of Mr. Gomez firing several shots. Someone outside the room made racket and said "they are coming." RP at 236. Ms. Nelson and Mr. Cuevas jumped out of bed. After they did, she heard a bullet penetrate the door to the room and lodge in clothing near the bed. The bullet would have hit Ms. Nelson in the forehead if she had not moved. Mr. Cuevas related he was sleeping in bed when he awoke to the sound of emergency sirens. He found a bullet had earlier penetrated the door to the room and lodged in clothing near the bed.

Viewing this evidence in the light most favorable to the State, a rational jury could find Mr. Gomez assaulted Ms. Glasby, Mr. Cloyd, Mr. de Jesus, and Mr. Cuevas beyond a reasonable doubt. We reject Mr. Gomez's arguments and defer to the jury's assessment of witness credibility and evidence weight. We conclude the State produced sufficient evidence to show either attempted battery or common law assault supporting Mr. Gomez's convictions for first degree assault of Ms. Glasby, Mr. Cloyd, Mr. de Jesus, and Mr. Cuevas.

---

criminal intent." *Id.* at 1075. This case concerns actus reus but not mens rea.

10

No. 31050-7-III
*State v. Gomez*

Reversed and remanded for a new trial.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public records pursuant to RCW

2.06.040.

Brown, J.

WE CONCUR:

Siddoway, A.C.J.

Fearing, J.

11