## Richmond

RICHMOND NEWSPAPERS, INC.

v.

COMMONWEALTH OF VIRGINIA, ET AL.

Record No. 801370.

THE FREE LANCE-STAR OF FREDERICKSBURG, ET AL.

v.

COMMONWEALTH OF VIRGINIA, ET AL.

Record No. 801580.

RICHMOND NEWSPAPERS, INC.

v.

COMMONWEALTH OF VIRGINIA, ET AL.

Record No. 810666.

IN RE: RICHMOND NEWSPAPERS, INC.

Record No. 801198.

IN RE: RICHMOND NEWSPAPERS, INC.

Record No. 801199.

September 11, 1981.

Present: All the Justices.

*Alexander Wellford (Andrew J. Brent; William F. Etherington; Russell H. Roberts; Christian, Barton, Epps, Brent & Chappell; Roberts & Ashby,* on briefs), for appellant.

*Walter H. Ryland, Chief Deputy Attorney General (Marshall Coleman, Attorney General,* on Brief) for appellees.

*Alexander Wellford (Andrew J. Brent; William F. Etherington; Russell H. Roberts; Christian, Barton, Epps, Brent & Chappell; Roberts & Ashby,* on briefs), for appellants.

*Walter H. Ryland, Chief Deputy Attorney General (Marshall Coleman, Attorney General,* on brief), for appellees.

*Alexander Wellford (Andrew J. Brent; William F. Etherington; Russell H. Roberts; Christian, Barton, Epps, Brent & Chappell; Roberts & Ashby,* on briefs), for appellant.

*Walter H. Ryland, Chief Deputy Attorney General (Marshall Coleman, Attorney General; Karen A. Gould, Assistant Attorney General,* on brief), for appellees.

*Alexander Wellford (Andrew J. Brent; William F. Etherington; Russell H. Roberts; Christian, Barton, Epps, Brent & Chappell; Roberts & Ashby,* on briefs), for petitioner.

*Walter H. Ryland, Chief Deputy Attorney General (Marshall Coleman, Attorney General,* on brief), for respondent.

*Alexander Wellford (Andrew J. Brent; William F. Etherington; Russell H. Roberts; Christian, Barton, Epps, Brent & Chappell; Roberts & Ashby,* on briefs), for petitioner.

*Walter H. Ryland, Chief Deputy Attorney General (Marshall Coleman, Attorney General,* on brief), for respondent.

STEPHENSON, J., delivered the opinion of the Court.

At issue in these cases is whether the public and the press have a constitutional right to attend pretrial proceedings in criminal

cases, and, if so, how that right should be balanced against an accused's constitutional right to a fair trial. This conflict between fair trial and free press is "almost as old as the Republic." *Nebraska Press Assn.* v. *Stuart,* 427 U.S. 539, 547 (1976).

## I.

These consolidated cases (three appeals and two original petitions) arise out of three criminal prosecutions.[1]

The following facts are undisputed.

## A.

### *The Hoard Case*

A Northumberland County grand jury indicted Ernst Edard Hoard for murder. On February 25, 1980, his counsel filed a motion to suppress certain statements made by Hoard. At the hearing on the motion, held February 28, 1980, Hoard moved for closure and the Commonwealth's Attorney concurred. A reporter for Richmond Newspapers, Inc., present in the courtroom, objected to closing the hearing to the public and requested an opportunity to have counsel present at a hearing on the closure motion. The trial court responded: "we are going to deny that request and grant the motion to close the hearing. If they want to file something later, let them come down and do so. . . ."

The following day Richmond Newspapers petitioned the court for permission to intervene "for the purpose of asserting defenses to any closure motions which may be made in this case." By order entered that day *nunc pro tunc* February 28, 1980, the hearing was closed and "[t]he objection of Richmond Newspapers, Inc., intervenor, . . . to the closure of the hearing . . . without a hearing on the closure in which counsel for the intervenor could participate, is noted and is hereby overruled."

---

[1] (i) *Commonwealth of Virginia* v. *Ernst Edard Hoard,* in the Circuit Court of Essex County, venue having been changed from the Circuit Court of Northumberland County, Record Nos. 801370, 801198 (petition for writ of mandamus), and 801199 (petition for a writ of prohibition).

(ii) *Commonwealth of Virginia* v. *Paul Myron Stephens,* in the Circuit Court of Caroline County, Record No. 801580.

(iii) *Commonwealth of Virginia* v. *Ida Catherine Jackson,* in the Circuit Court of Greene County, Record No. 810666.

Subsequently, counsel for Richmond Newspapers wrote a letter to the Commonwealth's Attorney and Hoard's counsel, with a copy to the clerk of court, advising that Richmond Newspapers had been permitted to intervene for the purpose of objecting to closure. The letter further stated that "[i]f there are to be any further motions for closure, please give this firm notice of intention to make the motions so that we may be present and have the opportunity to be heard."

On July 10, 1980, Hoard filed motions to change venue and to suppress certain photographs. These motions were heard by the court on July 22. The motion to change venue was heard in open court and was granted.[2] After the hearing on change of venue, Hoard moved for a closed hearing on the suppression motion.

Three newspaper reporters[3] voiced objection to closure and requested an opportunity to have counsel present and to record the proceedings. The Commonwealth's Attorney concurred in Hoard's closure motion.[4] The trial court held:

---

[2] In support of his motion for change of venue, Hoard filed an exhibit containing approximately sixty newspaper clippings from newspapers having circulation in Northumberland County. Also, sixteen affidavits executed by citizens of Northumberland County (which has a population of less than 10,000) were introduced indicating that each affiant, based on his personal knowledge as well as conversations with others, was of opinion that Hoard could not receive a fair trial in Northumberland County due to the amount of publicity.

[3] Two reporters represented Richmond Newspapers, and the third was from the Rappahannock Record.

[4] The Commonwealth's Attorney's postion on the closure motion was stated as follows:

My position at this point is the news media is making a travesty of justice in these cases. We have the *Gannett* case, which laid down exactly what the Supreme Court felt was proper, and the more recent decision about the closing of trials. I concur with the Supreme Court of the United States on the open trials. I do believe that people in the community have a right to know what is going on. I also concur with the Supreme Court of the United States in *Gannett*, which indicated that publicity concerning pre-trial suppression hearings, such as the one we are involved in, impose special risks of unfairness, and danger of publicity of pre-trial suppression is particularly acute. It may be difficult to measure with any degree of certainty the effect of such publicity on the fairness of the trial. The motion for the change of venue has been brought about by adverse publicity and I concur in the motion of Mr. Haynie's to close this suppression hearing for the reasons he has stated. If his motion was not granted by this court, the newspapers would print in this evenings newspaper and tomorrow mornings papers all of the information that was mentioned in this court which could be possible evidence that could not be admitted. I would submit at that point it would be very difficult to give the defendant a fair trial and I would, therefore, concur in closing this part of the hearing.

this hearing . . . , it's not the trial itself, it's a preliminary motion, and we think it's in the interest of seeing that this defendant gets a fair trial and, also, for other reasons, the hearing will be closed . . . .

As far as the statements made to the Court by members of the press concerning the right to be heard, we will grant any counsel the right to be heard. We are not going to sit here and wait for counsel to come down and be heard . . . .

The trial judge observed that he did not "believe this Court has been given any strict guidelines to follow in ruling on such a motion." Thereafter, a closed suppression hearing was conducted, and the court refused to suppress the photographs.[5]

The court, on August 1, 1980, entered an order *nunc pro tunc* July 22, 1980, closing the suppression hearing on authority of Code § 19.2-266[6] and overruling Richmond Newspapers' objection. Richmond Newspapers appealed from this order and also filed original petitions for writs of mandamus and prohibition in this Court.

## B.

### *The Stephens Case*

Paul Myron Stephens was indicted for two murders by a Caroline County grand jury. He filed written motions for a change of venire and for the suppression of certain evidence which were heard on July 8, 1980. At that time, Stephens moved to close the hearings on both motions, contending that closure was necessary to protect his rights. The Commonwealth's Attorney opposed closure.

The trial court refused to close the hearing on the motion to change venire and that motion was denied. Thereafter, the trial court refused to close the suppression hearing, stating it did so on the "assumption that the substance of this motion can be covered adequately and properly without the necessity of going into the

---

[5] Hoard later pleaded guilty and was sentenced to sixty years.
[6] Code § 19.2-266 reads in pertinent part:
In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any persons whose presence would impair the conduct of a fair trial, provided that the right of the accused to a public trial shall not be violated.

substance of the statement." The court further stated that "[i]f that proves to be impossible, then I will reconsider the motion." Following a conference with counsel, the court announced:

> Gentlemen, counsel have represented to me through some explanation that it is impossible to go into the circumstances surrounding this motion without going to some extent into the substance of the evidence sought to be suppressed. It's very important to the integrity of this proceeding and to the Court's ability to afford both the Commonwealth and the accused a fair trial; that neither side . . . be hamstrung in its exploration of the circumstances surrounding this motion. I don't want either side to have to mince words out of concern for what might be spread abroad. I know of no way to insulate the proceedings on this motion from public broadcast. It's not as though the jury who were going to try this case had been impaneled and had been sequestered. I know of no way to protect the evidence and the circumstances which may be elicited in this hearing except . . . to close the hearing. I must take note that we are now a . . . week and a day . . . from trial and the publicity at this time will have a different qualitative effect from publicity months ago, and I think that there is no alternative but for me to determine that there is an overriding need for me to close the hearing. I think to do otherwise would be to significantly, perhaps fatally, jeopardize the integrity of this proceeding. Therefore, the motion to close the hearing will be granted . . . .

At that point, three representatives of the press (including reporters for Richmond Newspapers and The Free Lance-Star) objected to closure and requested an opportunity to be heard and to have counsel present. The court responded that it was not going to delay the proceeding and, in a closed hearing, denied the suppression motion.[7]

On July 10, The Free Lance-Star and Richmond Newspapers filed a petition to intervene for the purpose of appealing the court's closure order. The court entered an order closing the suppression hearing "pursuant to Virginia Code Section 19.2-266 and

---

[7] Stephens was tried by a jury, convicted of both murders, and sentenced to one hundred years in the penitentiary. He has appealed.

for the reasons stated from the bench," and overruled the newspapers' objections.

## C.

### *The Jackson Case*

Ida Catherine Jackson was indicted for murder by a Greene County grand jury. The Commonwealth's Attorney and Jackson's counsel jointly filed a motion *in limine* which was heard on March 3, 1981. At the hearing, the Commonwealth's Attorney moved for closure, arguing that:

> [i]n order for the Court to make an intelligent ruling on this matter, it will be necessary for me to disclose certain items that I expect to be able to produce into evidence and I, it's my opinion—shared in by Mr. Chandler [Jackson's counsel]—that . . . it might imperil the right of Mrs. Jackson to an impartial jury if these were disclosed to the press at this time . . . .

Jackson concurred in the closure motion. Thereupon, a reporter for Richmond Newspapers objected to closure and asked for a delay until counsel could appear. The trial court stated that the reporter had no standing in the matter and that it would not delay the proceedings.

Following the closed hearing, the trial court stated it had been advised prior to closure that:

> a proffer of expected evidence would be made which could be highly prejudicial and would potentially interfere with a fair trial . . . . [t]he Court having heard the offer of expected evidence, finds that it is highly prejudicial and that if offered in open court might substantially interfere with a fair trial for the accused. We find that the closing of the hearing in this joint motion was necessary to prevent substantial prejudice which would prevent a fair trial in this case.

Richmond Newspapers' petition to intervene for the purpose of challenging the trial court's action was filed March 17, 1981, and was heard on March 24. The trial court permitted intervention "for the limited purpose as set out in the petition," and an order to that effect was entered March 24, *nunc pro tunc* March 3, clos-

ing the hearing "to the public and the press pursuant to Virginia Code Section 19.2-266 and for the reasons stated from the bench," and overruling the Newspapers' objection to closure.[8]

## II.

The right of an accused to a fair trial has been called "the most fundamental of all freedoms." *Estes* v. *Texas,* 381 U.S. 532, 540 (1965). Central to this "basic requirement of due process," *In re Murchison,* 349 U.S. 133, 136 (1955), is the concept of trial by an impartial jury of one's peers, the cornerstone of "the American scheme of justice." *Duncan* v. *Louisiana,* 391 U.S. 145, 149 (1968).

These rights are guaranteed to all Virginians not only by the Federal Constitution, but also by Article I, Section 8, of the Virginia Constitution. They have been reinforced both by statute and by case law. Thus, in order to secure a fair trial, a circuit court may order a change of venire, Code § 8.01-363, or a change of venue, Code § 19.2-251. (*See Poindexter* v. *Commonwealth,* 218 Va. 314, 237 S.E.2d 139 (1977), and cases cited therein.) The trial court is required to question prospective jurors to make sure they are unbiased, Rule 3A:20, and counsel is also given the right to conduct *voir dire.* Code § 8.01-358. When necessary, the jury may be sequestered. Code § 19.2-264.

A necessary adjunct to a fair trial is an open trial. The presence of the public will ensure that an accused's rights are not denied.

> The right to a public trial . . . "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."

*Gannett Co.* v. *DePasquale,* 443 U.S. 368, 380 (1979), quoting *In re Oliver,* 333 U.S. 257, 270 (1948).

The right to a public trial is found in the Sixth Amendment of the Federal Constitution. However, the Supreme Court has held that this right is for the protection of the accused. *Gannett,* 443

---

[8] At the time of oral argument, Jackson had not been tried.

U.S. at 381. It is therefore personal to the accused and cannot be enforced by the public. *Id.*

At the same time, the Supreme Court has recognized that the public has an interest in trials above and separate from that of the defendant.

> There can be no blinking the fact that there is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system.

*Id.* at 383. This observation of trials serves both a therapeutic value, as an outlet for community concern when a shocking crime occurs, *Richmond Newspapers, Inc.* v. *Virginia,* 448 U.S. 555, 569-73 (1980), and as a means for the public to see that all citizens are treated equally. *Id.* at 593-97 (Brennan, J. concurring).

This societal interest in open trials was made explicit in *Richmond Newspapers* when the court held that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." 448 U.S. at 581. The court based its holding not on the Sixth Amendment but on the First Amendment, whose combined rights of press, speech, assembly and petition "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Id.* at 575.

The question of the public's independent right to attend trials arises because the defendant sometimes wishes to waive his right to an open trial. Faced with the prospect of publicity which will make it difficult to impanel an impartial jury, the accused, as was done in the cases before us, may seek to exclude the press and the public. The Supreme Court "has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial" and that the trial judge has "an affirmative constitutional duty to minimize the effects of . . . publicity." *Gannett,* 443 U.S. at 378. *See also Sheppard* v. *Maxwell,* 384 U.S. 333 (1966); *Estes* v. *Texas,* 381 U.S. 532 (1965).

It is this conflict between the defendant's right to a fair trial and the public's right to be present in the courtroom that we must

resolve today. Were we faced with the closure of a criminal trial, our task would be easy—the result mandated by *Richmond Newspapers.* Instead, the closure orders we consider involve *pretrial* hearings. This issue was not addressed in *Richmond Newspapers,* and nothing in that opinion dictates our result. *Richmond Newspapers,* 448 U.S. at 599 (Stewart, J. concurring); A. Cox, *Foreword: Freedom of Expression in the Burger Court,* 94 Harv. L. Rev. 1, 22-23 (1980); *The Supreme Court, 1979 Term,* 94 Harv. L. Rev. 75, 156, n. 42 (1980).

In both *Gannett* and *Richmond Newspapers,* those in favor of an open courtroom relied on the long common-law tradition of public trials. 443 U.S. at 418-27 (Blackmun, J. concurring and dissenting); 448 U.S. at 564-69; 448 U.S. at 589-93 (Brennan, J. concurring). Virginia shares in this tradition. 448 U.S. at 567. However, as Justice Stewart points out, "there exists no persuasive evidence that at common law members of the public had any right to attend pretrial proceedings; indeed, there is substantial evidence to the contrary." *Gannett,* 443 U.S. at 387; *See also Id.* at 394-95 (Burger, C.J. concurring); *Id.* at 436 (Blackmun, J. concurring and dissenting). Thus, to the extent that the holding of *Richmond Newspapers* relies on this history, it is inapplicable to *pretrial* hearings.

Pretrial hearings, of course, take on varied forms and purposes. We are concerned here with what is generally referred to as a "suppression hearing." Suppression hearings are conducted in advance of trial pursuant to an accused's motion to exclude or suppress certain evidence which he alleges is inadmissible at trial. In recent years, following the Supreme Court's adoption of the so-called "Exclusionary Rule," suppression hearings have become commonplace in our criminal jurisprudence.

That there is no common law history regarding suppression hearings is understandable, for, as Chief Justice Burger said in *Gannett:* "[w]hen the Sixth Amendment was written, and for more than a century after that, no one could have conceived that the exclusionary rule and pretrial motions to suppress evidence would be part of our criminal jurisprudence." 443 U.S. 395-96 (Burger, C.J. concurring).

■ Suppression hearings pose special problems in balancing the rights of the defendant against those of the public.

Publicity concerning pretrial suppression hearings . . . poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. . . . Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized during a pretrial proceeding, however, it may never be altogether kept from potential jurors. Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the trial itself has even begun. [Citations and footnotes omitted.]

*Gannett,* 443 U.S. at 378-79.

At the same time, the public's interest in the conduct of the judicial system may be even more acute when pretrial hearings are involved. *Gannett,* 443 U.S. at 433-36 (Blackmun, J. concurring and dissenting). It is at suppression hearings that evidence of alleged police-prosecutor misconduct necessitating the exclusion of evidence will come to light. *Id.* at 428. The public has the right to judge for itself whether the proper balance is being struck between preventing this misconduct and the possibility that the guilty may go free.

Further, in many cases the suppression hearing is the only adversary proceeding the accused will have in resolving his case. 443 U.S. at 397, n. 1 (Powell, J. concurring). It may have all the trappings of the trial itself. *Id.* at 433-36 (Blackmun, J. concurring and dissenting). Approximately eighty-five percent of all criminal trials are resolved by guilty pleas, frequently after a suppression motion has been decided. 443 U.S. at 397 (Burger, C.J. concurring). (Indeed, this is what happened in the *Hoard* case.)

■ We believe pretrial suppression hearings are as important to our criminal justice system as the trial itself, and to allow the public to view the trial without any knowledge of what has taken place previously would make the right of access granted in *Richmond Newspapers* a hollow one. Therefore, we hold that absent "an overriding interest articulated in findings," *Richmond Newspapers*, 448 U.S. at 581, such hearings should be open to the public.

■ This holding we feel is mandated both by Article I, Section 12 of the Virginia Constitution and by the United States Constitution, as construed in *Richmond Newspapers*. However, we rest our decision on Article I, Section 12, for, as the Commission on Constitutional Revision stated:

[t]hat most of the provisions of the Virginia Bill of Rights have their parallel in the Federal Bill of Rights is . . . no good reason not to look first to Virginia's Constitution for the safeguards of the fundamental rights of Virginians. The Commission believes that the Virginia Bill of Rights should be a living and operating instrument of government and should, by stating the basic safeguards of the people's liberties, minimize the occasion for Virginians to resort to the Federal Constitution and the federal courts.

REPORT OF THE COMMISSION ON CONSTITUTIONAL REVISION, p. 86 (1969). Other courts have decided this issue by resort to their states' constitutions. *Pennsylvania* v. *Hayes*, 6 Med. L. Rep. 1273 (Pa. Sup. Ct., May 1, 1980); *Federated Publications* v. *Kurtz*, 94 Wash.2d 51, 615 P.2d 440 (1980); *Herald Mail* v. *Hamilton*, 6 Med. L. Rep. 1343 (W. Va. Sup. Ct., June 10, 1980); *Williams* v. *Stafford*, 589 P.2d 322 (Wyo. 1979).

■ *Richmond Newspapers* does not discuss the test to be employed in deciding what is an "overriding interest." In *Gannett*, two views were presented. The four dissenting Justices would require the accused to establish a "strict and inescapable necessity" for closure. 443 U.S. at 440. Justice Powell, on the other hand, suggested that the question to be resolved by the trial court when closure has been requested "is whether a fair trial for the defendant is likely to be jeopardized by publicity, if members of the press and public are present and free to report prejudicial evi-

dence that will not be presented to the jury." *Id.* at 400 (Powell, J. concurring).

We believe the standard advanced by the *Gannett* dissent is too strict and inflexible and, as stated by Justice Powell:

> [i]t is difficult to imagine a case where closure could be ordered appropriately under . . . [the dissenters'] standard. A rule of such apparent inflexibility could prejudice defendants' rights and disserve society's interest in the fair and prompt disposition of criminal trials. As a result of pretrial publicity, defendants could be convicted after less than the meticulously fair trial that the Constitution demands. There also could be an increase in reversal of convictions on appeal . . . .

*Id.* at 399-400.

We believe that the Powell standard strikes the proper balance between the interests of the accused and those of the public. It will permit trial courts to exercise their discretionary powers in a way consistent with the constitutional mandate we outline today. Accordingly, an "overriding interest" exists to justify closure when "a fair trial for the defendant is likely to be jeopardized" by an open pretrial hearing. *Accord, U.S.* v. *Edwards,* No. 80-294 (D.C. App., May 8, 1981); *See U.S. Judicial Conference Guidelines on Fair Trial/Free Press,* 6 Med. L. Rep. 1897, 1907-08.

■ Before closing a pretrial hearing, the trial court should consider whether there are alternatives available which would eliminate the likelihood of prejudice to the accused. While there are fewer alternatives available at pretrial than at trial, *Richmond Newspapers,* 448 U.S. at 581; *U.S.* v. *Edwards,* No. 80-294, slip op. at 51-52 (D.C. App., May 8, 1981), they should be explored before closure is employed. When it is not possible to hold the entire hearing in public, only that portion that would be prejudicial should be closed. *See Richmond Newspapers,* 448 U.S. at 598, n. 23 (Brennan, J. concurring); *U.S.* v. *Edwards,* slip op. at 52-53; *New York* v. *Crimmins,* 7 Med. L. Rep. 1256 (N.Y. Sup. Ct., March 9, 1981).

## III.

■ The great majority of cases attract no publicity while moving through our criminal justice system. Motions for closure are

made infrequently, and cases justifying closure are quite rare. Nevertheless, before a hearing is closed, interested members of the public should have the right to be heard, with the assistance of counsel if desired. Intervention is necessary to give substance to the qualified right of access discussed herein. *Gannett,* 443 U.S. at 401 (Powell, J. concurring).

While this is not the proper forum for rule making, *See* Code §§ 8.01-3, 17-116.4 and 16.1-69.32, the trial courts are entitled to some guidance on the procedure to be followed when a motion for closure is made. (See the comments of the trial judge in *Hoard,* page 581, *supra.*) The procedures we establish are designed to ensure that the public's right of intervention in a criminal proceeding does not interfere with the accused's right to a speedy trial as guaranteed by constitution and statute. *Gannett,* 443 U.S. at 398 (Powell, J. concurring).

■ For intervention to take place, the public must have notice of the closure motion. *Contra, Id.* at 401. For this reason, motions to close a hearing should be made in writing and filed with the court before the day of the hearing involved, and the public must be given reasonable notice that a closure hearing will be conducted.[9]

■ At the hearing on closure, the burden will be on the moving party to show that an open hearing would jeopardize the defendant's right to a fair trial. *Id.* The intervenors, however, shall have the burden of showing that reasonable alternatives to closure are available. *Id.* Upon entering a closure order, the trial judge shall articulate on the record his findings that the evidence supports the moving party's contention that an open hearing would jeopardize the defendant's fair-trial rights, that alternatives will not protect these rights, and that closure will be effective in protecting them. *See U.S.* v. *Edwards,* slip op. at 53-54.

■ There is the danger that the information sought to be kept from the public will be disclosed in the hearing on closure, thereby negating the purpose of closure. To protect against this, the trial court may hear or observe this information *in camera* in order to establish to what extent its release would be prejudicial to the defendant. *Connecticut* v. *Burak,* 7 Med. L. Rep. 1318 (Conn. Sup. Ct., March 19, 1981); *Patuxent Publishing* v. *Maryland,* 7 Med.

---

[9] While we make no decision regarding what would constitute reasonable notice, we note that counsel for the newspapers conceded at oral argument that one day's notice posted at the front door of the courthouse would be sufficient.

L. Rep. 1349 (Md. Ct. of Sp. Ap., May 12, 1981). (We reject the idea that the entire closure hearing need be closed. *Contra, Williams* v. *Stafford,* 589 P.2d 322, 326 (Wyo. 1979).) To the extent this procedure may deny the public's right of access, such right for this limited purpose, must yield to "the defendant's superior right to a fair trial." *Richmond Newspapers,* 448 U.S. 564; *See also* at 598, n. 23 (Brennan, J. concurring).

## IV.

The newspapers ask us to find that Code § 19.2-266 "confers an unconstitutionally broad discretion upon trial courts to interfere with the right of the public and the press to open courtrooms." The first paragraph of § 19.2-266 reads:

> In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any persons whose presence would impair the conduct of a fair trial, provided that the right of the accused to a public trial shall not be violated.

Code § 19.2-266 merely restates certain inherent powers of a trial court. *Burford* v. *Commonwealth,* 179 Va. 752, 760-61, 20 S.E.2d 509, 512 (1942). A court must have the power and authority to remove persons from the courtroom who are causing a disturbance or are otherwise disrupting the orderly conduct of a trial, *See Richmond Newspapers,* 448 U.S. at 581-82, n. 18, and a judge is vested with such discretion absent the provisions of § 19.2-266. In exercising such discretion, however, the trial judge must not act arbitrarily nor violate or abridge guaranteed constitutional rights.

A statute may be constitutional on its face, yet be unconstitutional as applied in a given case. Thus, in *Cumbee* v. *Commonwealth,* 219 Va. 1132, 254 S.E.2d 112 (1979), the trial court, over the defendant's objection, ordered the courtroom cleared of spectators in view of "the type of case." We held "that the act of clearing the courtroom violated defendant's constitutional right to a public trial." *Id.* at 1136, 254 S.E.2d at 115.

A similar problem may occur if a court, relying solely on Code § 19.2-266, denies the public and the press access to a pretrial hearing. Unless the standard for closure previously discussed has been established in accordance with the procedures outlined

above, the closure of a pretrial hearing pursuant to the authority of § 19.2-266 would be violative of Article I, Section 12 of the Constitution of Virginia and the First Amendment to the Federal Constitution. We hold, therefore, that Code § 19.2-266 is, if properly applied, constitutional.

## V.

We turn now to the rulings of the trial courts in the cases before us. While the closure orders in these cases, to a large extent, were mooted by the termination of the criminal proceedings against the defendants, both the parties and the trial judges are entitled to a decision on the merits. *See Richmond Newspapers,* 448 U.S. at 563; *Gannett,* 443 U.S. at 377-78.

At the outset, we recognize the difficult task faced by the trial judges when the closure motions were made. Involved were two recent Supreme Court decisions (*Gannett* and *Richmond Newspapers*), the second of which contained seven opinions. Justice Blackmun noted the uncertainty of the standard being enunciated by the Court. *Richmond Newspapers,* 448 U.S. at 603 (Blackmun, J. concurring). Each judge was properly concerned with providing the defendant a fair and speedy trial. Each allowed third-party intervention to test the closure order on appeal.[10]

Nevertheless, for the reasons expressed herein, we conclude that all three judges erred in ordering closure without affording the intervenors a hearing on the merits. Absent a hearing, there could be no record of the necessary findings to support closure.

Accordingly, the order entered August 1, 1980, in the case of *Commonwealth of Virginia* v. *Ernst Edard Hoard* (Record No. 801370), in the Circuit Court of Northumberland County, the order entered July 10, 1980, in the case of *Commonwealth of Virginia* v. *Paul Myron Stephens* (Record No. 801580), in the Circuit Court of Caroline County, and the order entered March 24, 1981, in the case of *Commonwealth of Virginia* v. *Ida Catherine Jackson* (Record No. 810666), in the Circuit Court of Greene County, will be reversed and vacated and the three cases remanded to the respective trial courts with the directive that each, upon request, release forthwith to the intervenors any and all re-

---

[10] Given the resolution of these cases on appeal, it is unnecessary for us to consider the petitions for mandamus and prohibition filed in *Hoard.*

cordings and transcriptions of the closed hearings not heretofore released.

*Reversed and remanded.*