**Salem**
*IN RE* TIMES-WORLD CORPORATION
No. 0379-88-3 and 0375-88-3
Decided October 18, 1988

318

COUNSEL

Thomas T. Lawson, E. Stan Barnhill (Woods, Rogers & Hazel-grove, on brief), for petitioner.

William H. Hauser, Senior Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for respondent.

OPINION

**KOONTZ, C.J.** — Times-World Corporation filed two petitions for writs of mandamus with this Court,[1] alleging that the trial court, at the criminal trial of John Henry Cassell, Jr., unconstitutionally denied public and press access to closed proceedings held in the judge's chambers, including the *voir dire* of potential jurors. We conclude that the trial court did not follow the proper procedures before closing the voir dire and subsequent hearings in chambers, thus, improperly denying access to the press and the public. Therefore, we reverse the closure rulings of the trial court and order that the press receive any transcript or recordings of the closed proceedings not heretofore released.

## I. FACTS

The trial of the present case began on March 21, 1988, in the Circuit Court of Patrick County. During a pretrial conference in the judge's chambers, the judge suggested bringing the veniremen into chambers in panels of four for voir dire purposes. Defense counsel requested bringing them into chambers one at a time so that he could get better "feedback" during questioning. The judge replied:

I think you will find you'll get a lot of feedback from four. When we bring them in here, they'll talk to you.

\* \* \* \*

A lot of them are not bashful about what they might say and, so I don't think we have any trouble there. If we went to one, we may not finish up today on the jury panel. Even with four, we are probably going to be after lunch before we get the jury panel slotted in. So, let's try the four and let's just see how they work.

No reason was stated at that time for conducting *voir dire* in chambers. No mention was made of accommodating the press or the public.

---

[1] By order of April 1, 1988, this Court consolidated the two petitions.

After the judge and counsel had examined several panels, the sheriff brought to the judge a business card of Greg Edwards, a reporter for Times-World Corporation, and stated that Mr. Edwards wanted to come in and observe *voir dire*. This discussion followed:

THE COURT: This gentleman asked to be present, of course, if I let him in I'd have to let all the rest of the news media in and I just don't have room to fool with them or time to fool with them.

COMMONWEALTH'S ATTORNEY: You might want to get a waiver from the defendant on that on the record if we could, Your Honor.

DEFENSE COUNSEL: We entirely agree with His Honor's position. The physical constraints, the space alone are insufficient to bring a horde of the press in here.

THE CLERK: And you have a dozen or more of them out there.

DEFENSE COUNSEL: Yes. And the Judge is absolutely right, if you let one in you have to let them all in and if we have any rights to demand that they be admitted, we waive it.

THE COURT: All right.

COMMONWEALTH'S ATTORNEY: I don't know that they do.

The court then proceeded with *voir dire*.

On the second day of trial, March 22, 1988, upon returning to the judge's chambers after adjourning for lunch, the following exchange occurred:

THE COURT: All right, gentlemen, the press seems to think we are spending more time in Chambers than we are in the courtroom and they have requested to be present in Chambers. Counsel have anything to say on

that?

DEFENSE COUNSEL: If Your Honor please, whatever the Court wishes to do is fine with me. If we have a right to have them present, I'll waive it. We'll take judicial notice that the Court's quarters here are unfortunately very cramped and you bring all the—if you bring any of them in, they'll all want to be here. They don't want somebody else taking advantage of them. I'm inclined to think the way this has been handled up to this point is the correct way to handle it.

COMMONWEALTH'S ATTORNEY: Your Honor, I've been in Chamber for 10 years and I've never seen anything happen that was improper and I don't think that anything does happen that is improper but I think that any time we get behind closed doors there is suspicion on, ah, inquiring minds as to what is going on and . . . my personal position [is] that we should let the press hear what's going on so that they don't have ideas something improper is going on.

THE COURT: I told them that we didn't have room for them and some of the things we talked back here that if they printed in the paper and the jury got hold of it, could very well—I'd have a mistrial. That didn't seem to concern them that much and I think they are going to file some kind of mandamus to be present. I told them—they wanted a hearing, I told them I didn't have time to conduct a hearing for them and conduct this trial too and for them to file anything they wanted to file and; so, we'll just let it go on the record. I told them, also, I think they have to report the news and the Court has to run the court and if the newspaper is going to start running, then I think I'll just get out of it.

On that same day, counsel for Times-World Corporation filed an original petition for a writ of mandamus in this Court. A hearing was scheduled for the afternoon of March 23, 1988, to compel the trial judge to open *voir dire* and other portions of the trial conducted in chambers without the presence of the press. Although the *voir dire* had already concluded, there were many

other motions which were also being heard in chambers. During the course of the three day trial, the trial judge held closed hearings in his chambers to hear arguments concerning (1) objection to opening remarks, (2) mistrial motion based on statements made in oral argument, (3) evidentiary issues, (4) scope of an in limine ruling, (5) motions to strike, (6) scope of testimony of rebutal witness, (7) proffer of a witness' testimony, (8) motion to set aside jury verdict, and (9) various other matters.

At 12:00 noon, on March 23, 1988, the third day of the trial, the trial judge held a hearing for the first time on the closure of portions of the trial. At that point, all evidence in the trial had been presented, except for the brief testimony of four rebuttal witnesses of the Commonwealth. Counsel for Times-World Corporation once again moved for press access to all portions of the trial.

The trial judge stated that it was his decision to conduct closed *voir dire* in chambers with both counsel and the defendant present, but without members of the press. He also stated that, although defense counsel did not request that the *voir dire* be closed to members of the press, the defense agreed with him to exclude the press. The trial judge stated that closed proceedings were necessary so the veniremen would give uninhibited answers to their questions.

The trial judge also ruled that the hearings conducted in chambers on evidentiary motions, motions to strike, and argument concerning the instructions, would remain closed. His reasoning for closing those portions of the trial, along with reiterating his reasons for closing *voir dire*, were: (1) there was insufficient room in chambers to accommodate members of the press; (2) during *voir dire*, there was a fear that the potential jurors would not respond frankly to questions concerning impartiality or their ability to consider the evidence if their responses were subject to publication; (3) since it was a three day trial, the judge did not want the jurors to hear in the news about trial matters not in evidence or *voir dire* proceedings and, thus, risk a mistrial; (4) the judge stated that he did not "see anything so pressing about this case that it [could not] be printed after the case [was] decided;" (5) it was too time consuming to assemble the press in chambers; (6) the media's presence would have precluded an informal-style for the hearings; (7) the design of the courthouse prevented easy movement of the jurors from the courtroom during motions; (8) no rooms were

available to hold the jury because the jury room was being used to sequester witnesses; and (9) there was no practical way to shield the jury from hearing bench conferences, other than conducting them in chambers, since the bench was very close to the jury box.

The trial ended later that afternoon, with the defendant being found not guilty.

## II. MOOTNESS ISSUE

▉ The Commonwealth has argued that we must dismiss this case because, since the trial is over, the matter is now moot. As a general rule, "[m]oot questions are not justiciable and courts do not rule on such questions to avoid issuing advisory opinions." *United States v. Peters*, 754 F.2d 753, 757 (7th Cir. 1985). However, issues concerning the closure to the public of criminal trials or hearings are generally moot by the time they reach an appellate court because of the typically short duration of a trial. The United States Supreme Court, in a case concerning whether the press has a right to attend criminal trials, stated:

> The criminal trial which appellants sought to attend has long since ended, and there is thus some suggestion that the case is moot. This Court has frequently recognized, however, that its jurisdiction is not necessarily defeated by the practical termination of a contest which is short-lived by nature. . . . If the underlying dispute is "capable of repetition, yet evading review," it is not moot.
>
> More often than not, criminal trials will be of sufficiently short duration that a closure order "will evade review, or at least considered plenary review in this Court." Accordingly, we turn to the merits.

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980)(citations omitted); *see also Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 592, 281 S.E.2d 915, 925 (1981).

▉ The Supreme Court relied upon the same reasoning in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 602-03 (1982), stating: "[J]urisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute

between the parties is one 'capable of repetition, yet evading review.' " *Id.* at 603 (citations omitted); *see also Press Enterprise Co. v. Superior Court,* 478 U.S. 1, 6 (1986).

■ The federal circuit courts also have embraced an exception to the mootness doctrine when deciding similar cases concerning closure of a trial to the public. "[T]he United States Supreme Court's recent mootness decisions suggest that closure orders entered during trial are precisely the kind of rulings which the *Southern Pacific* mootness exception is meant to protect." *United States v. Peters,* 754 F.2d 753, 758 (7th Cir. 1985); *see also United States v. Edwards,* 823 F.2d 111, 114 (5th Cir. 1987), *cert. denied sub nom, Times-Picayune Pub. Co. v. Edwards,* 108 S. Ct. 1109 (1988).

Likewise, we hold that the issues raised in the petitions of Times-World Corporation are capable of repetition yet evading review. Based upon the reasons stated by the trial judge on the record to justify closure, it is reasonable to assume that Times-World Corporation will be subjected to similar closure orders in Patrick County. Further, due to the typically short duration of criminal trials, the issues raised here will never be addressed on the merits if we accept the argument that the matter has been rendered moot by the conclusion of trial. As the Supreme Court of Virginia stated in *Richmond Newspapers, Inc.*: "[W]hile the closure orders in these cases . . . were mooted by the termination of the criminal proceedings against the defendants, both the parties and the trial judges are entitled to a decision on the merits." *Richmond Newspapers, Inc.,* 222 Va. at 592, 281 S.E.2d at 925.

## III. APPLICABLE LAW

■ *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980), was the first United States Supreme Court case to address the first amendment right of the press to attend criminal trials. Of the seven separate opinions upholding the press' first amendment right, Justice Brennan's concurring opinion proposed "two helpful principles," which became the basis for subsequent decisions, to aid in setting practical limits on access rights: (1) the right of access claim is stronger where there is a tradition of openness to the particular proceeding or information at issue; and (2) access should be granted whenever it furthers the functioning or purposes

of the particular process involved. *Id.* at 589 (Brennan, J., concurring).

■ Subsequently, in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982), Justice Brennan's majority opinion established a "strict scrutiny test" to be employed when access rights are limited. The right of access can be outweighed only by a "compelling governmental interest" and the denial must be "narrowly tailored to serve that interest." *Id.* at 606-07.

■ *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984), (referred to as *Press-Enterprise I*), was the first case to address the right of access to *voir dire* proceedings in a criminal case. "[S]ince the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." *Id.* at 505. The court used the "tradition of openness" and "contribution to function" principles in upholding this right of access and stated that government attempts to deny access had to meet *Globe*'s strict scrutiny standard. *Id.* at 510. The Court stated:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.*

■ *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986)(*Press-Enterprise II*), also relied upon the tests of a tradition of access to the preliminary proceeding and whether the access plays "a significant positive role in the functioning of the particular process in question." *Id.* at 8. "If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.* at 9 (citing *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982)). However, this access is not absolute, and the court reiterated its strict scrutiny holding of *Press-Enterprise I*, stating that the presumption of openness can be overcome if the trial court narrowly tailors its closure orders and makes specific findings justifying its decision. *Press-Enterprise II*, 478 U.S. at 9-10.

The Supreme Court of Virginia, in *Richmond Newspapers, Inc. v. Commonwealth*, 222 Va. 574, 281 S.E.2d 915 (1981), established certain guidelines for determining whether to grant a closure motion in a criminal trial. Although the case was decided before *Press-Enterprise I*, which upheld a right of access by the public to *voir dire* proceedings, its guidance is still applicable to closure hearings generally:

> For intervention to take place, the public must have notice of the closure motion. For this reason, motions to close a hearing should be made in writing and filed with the court before the day of the hearing involved, and the public must be given reasonable notice that a closure hearing will be conducted.

> At the hearing on closure, the burden will be on the moving party to show that an open hearing would jeopardize the defendant's right to a fair trial. The intervenors, however, shall have the burden of showing that reasonable alternatives to closure are available. Upon entering a closure order, the trial judge shall articulate on the record his findings that the evidence supports the moving party's contention that an open hearing would jeopardize the defendant's fair-trial rights, that alternatives will not protect these rights, and that closure will be effective in protecting them.

> There is the danger that the information sought to be kept from the public will be disclosed in the hearing on closure, thereby negating the purpose of closure. To protect against this, the trial court may hear or observe this information *in camera* in order to establish to what extent its release would be prejudicial to the defendant.

*Richmond Newspapers, Inc.*, 222 Va. at 590, 281 S.E.2d at 924 (citations omitted).

## IV. ANALYSIS

The present case is unusual in that the trial court apparently closed the hearings without either party requesting such action. In addition, the hearing to determine whether closure was appropriate took place after most of the proceedings the press sought to

attend had concluded.

In the first instance, the trial court clearly was not concerned, or possibly aware, "that absent 'an overriding interest articulated in findings,' *Richmond Newspapers*, 448 U.S. at 581, such hearings should be open to the public." In fact, the court appeared to be under the mistaken belief that press access to the trial was dependent upon the defendant's request to have reporters present.

Furthermore, the court failed to give adequate notice of the closure hearing or provide an opportunity for the press to present alternatives to closure. In addition, the hearing should have taken place before the closure order took effect. It is at that point that the trial court should have taken the opportunity to articulate its reasons for closure if it found doing so was necessary.

Of the reasons that the trial court gave for closing the *voir dire* and evidentiary hearings to the press, most were based on inconvenience to the court. We hold that none of the stated reasons rise to the level of an "overriding interest" that outweighs the first amendment right of public access. *See Press-Enterprise I*, 464 U.S. at 510. In addition, even if closure was appropriate for part of the proceedings, the closure order was not "narrowly tailored" in this case to suit the need. *See id.* The hearings conducted in chambers during the trial consisted of more than mere bench conferences; they included the hearing of disputed testimony, a motion to strike the testimony of a witness, a motion to strike the Commonwealth's case-in-chief, a motion to strike all of the evidence at the end of trial, two motions for a mistrial, and the selection of jury instructions. We, therefore, reject the Commonwealth's argument that the hearings held in chambers were mere side-bar conferences not subject to the first amendment rights of the public and press.

The trial court's concern over the lack of space in chambers did not necessarily mandate closing the entire hearing just because it could not accommodate every member of the local press. Moreover, the court never gave the press an opportunity to present alternatives to complete closure before the March 23, 1988 hearing. In addition, during that hearing, which was also inexplicably held in chambers, eight representatives of the media were accommodated in the judge's chambers, along with the judge, five attorneys, and the court reporter, although the court described the

chambers as "a little crowded."

■ The trial judge also expressed concern that, since this was a three day trial, it would be very difficult to sequester the jury overnight, thus risking exposure to news reports about evidence which might be ruled inadmissible. As stated in *Thompson v. Commonwealth*, 219 Va. 498, 500, 247 S.E.2d 707, 708 (1978):

> [J]urors serving in a criminal case may not, during the trial, properly read newspaper stories or listen to media reports discussing the proceedings. The basis for this elementary proposition is that a juror's information about the case should come only from the evidence presented at trial and not from any extraneous source.

*See also Model Jury Instructions: Criminal*, I-8.1, -8.2 (Supp. 1987). However, the potential for danger in this situation can be mitigated by instructing the jury, as is routine, to avoid receiving any outside information during any recess. In fact, the trial judge in the present case gave such an instruction at the close of evidence on the first day of trial, stating:

> All right. Ladies and gentlemen of the jury, we will adjourn for today and let me caution you that while we are apart do not discuss this case with anyone, do not discuss it among yourselves, do not allow anyone to discuss it with you and do not make any investigations on your own. I would, also, ask that while we are apart for you to refrain from reading anything in the newspaper about this case or watching anything on TV or listening to anything on the radio. We want you, ladies and gentlemen, to decide this case on the evidence you hear from the witness stand and not anything else. So, I would ask you not to read or see or hear anything other than what you hear from the witness stand.

This warning was essentially repeated to the jury at lunch breaks and at the close of trial on the second day, at which time the court stated:

> I would, also, ask that you not read any newspaper items about this case, listen to any radio broadcast or any television or anything from the news media. If you would just confine yourself to what you've heard from the witness stand and

not anything you hear from the outside.

"Unless the record shows to the contrary, it is to be presumed that the jury followed an explicit cautionary instruction. . . ." *Albert v. Commonwealth*, 2 Va. App. 734, 741, 347 S.E.2d 534, 538 (1986)(quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983)). The trial court, therefore, had taken adequate precautions to alleviate its concern that the jury might be influenced by the media during recesses.

In addition, the judge's closure of the entire *voir dire* based on his and defense counsel's belief that the veniremen might not be completely candid in their responses if their answers to *voir dire* questions were subject to being printed in the paper, was unwarranted. Based on the transcript of the pretrial conference in chambers, it appears that the frankness of the veniremen in responding to questions was not an initial concern of the trial judge. In any event, even if that was a concern, but not articulated until the hearing, *Press-Enterprise I* outlines the procedures that the trial court should have followed when faced with this situation:

To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy. This process will minimize the risk of unnecessary closure. The exercise of sound discretion by the court may lead to excusing such a person from jury service. When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the ju-

ror's valid privacy interests. Even then a valid privacy right may . rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment.

*Press-Enterprise I*, 464 U.S. at 512.

Clearly the trial court, in this case, did not follow the basic tenet "that absent 'an overriding interest articulated in findings,' *Richmond Newspapers, Inc.*, 448 U.S. at 581, such hearings should be open to the public." *Richmond Newspapers, Inc.*, 222 Va. at 588, 281 S.E.2d at 922. A trial court, in deciding that closure might be warranted, or upon motion of either party, should give adequate notice of the closure hearing and provide an opportunity for the media to present alternatives to closure. Also, the closure hearing must take place before the closure order takes effect. In addition, if the court decides that closure is necessary, it must articulate the basis for its finding of an *overriding interest* that requires closure, that closure is *essential* to preserving higher values than the presumption of openness, and the closure order must be *narrowly tailored* to serve that interest.

We hold in the present case that the trial court erred in conducting closed proceedings without sufficient "overriding interest" articulated in the record, without first conducting a hearing on the matter, and without narrowly tailoring its closure order. Accordingly, the order of the trial court closing the proceedings to the press is reversed and the writ of mandamus shall issue directing that the trial court release any recordings or transcripts of the closed proceedings that have not heretofore been released.

*Writ Issued.*

Benton, J., and Cole, J., concurred.