PER CURIAM.
Consolidated Publishing Company, Inc. (“Consolidated”), publisher of the Tallade-ga Daily Home and the Anniston Star; Bill Keller, individually, and as editor-publisher of the Daily Home; and Michael Anderson, a reporter for the Daily Home (all hereintogether referred to as “Consolidated”) petition this Court for a writ of mandamus to Judge Jerry Fielding of the Circuit Court of Talladega County.

Factual Background and Proceedings in the Circuit Court

In November 1986, Shep Wilson, Jr., was convicted in the Talladega County Circuit Court of kidnapping, rape, and murder, and *425 was sentenced to death. This Court reversed that conviction and remanded the cause for a new trial, because the prosecutor, in his closing arguments to the jury, had made “a direct comment on [Wilson’s] failure to testify,” Ex parte Wilson, 571 So.2d 1251, 1265 (Ala.1990). The case is now awaiting retrial in the Talladega County Circuit Court.
On February 14, 1991, Wilson filed a “Motion to Seal File and for Closure of All Proceedings Prior to Jury Sequestration.” Employees of the Daily Home were served with a copy of the closure motion, and Consolidated’s lawyers attended the hearing on that motion.
At the hearing on the closure motion, Wilson offered in support of his motion a catalog of Daily Home articles; the testimony of Charles Osborne, the Daily Home’s circulation manager; and the testimony of Janice Keith, the Daily Home’s news editor. The trial court orally granted the motion at the end of the hearing.
Consolidated moved to vacate the trial court’s order, and after argument on Consolidated’s motion to vacate, the trial court entered a written order, which stated in pertinent part:
“[T]his Court finds:
“A. That this case has been attended by massive publicity as revealed in defendant’s exhibit I.
“B. That the press has repeatedly shown that, given the opportunity, it will publish details of the evidence, including evidence that could not be admitted at trial;
“C. That if the press were allowed to attend the pretrial hearings, it would publish the details, thus making it difficult to find jurors who were not aware of the evidence prior to trial.
“D. That there is a substantial probability that the defendant Wilson’s right to a fair trial will be prejudiced without enforcement of the closure order and the sealing of the file.
“E. That there are available no reasonable less restrictive alternatives to closure that would adequately protect the defendant’s right to a fair trial. The Court’s attempt for voluntary restraint was rejected.
“F. That there is a substantial probability that enforcement of the closure order and the seal of file will enhance de facto and de jure enjoyment of the constitutional rights defendant Wilson invokes.
“WHEREFORE, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that this Court finds defendant’s aforementioned motion to be necessary and appropriate and it is therefore ordered that all pretrial hearings in this trial of this defendant, Shep Wilson, Jr., shall be closed to the public, print and electronic media until the jury is selected.
“IT IS FURTHER ORDERED that the case file, Number CC-86-093.02 shall be sealed and closed to the public, print and electronic media until the jury is selected.
“IT IS FURTHER ORDERED that this order of closure and order to seal the file is subject to continuing review by this Court to insure that this infringement on the rights of the press and media shall be kept to an absolute minimum.
“IT IS FURTHER ORDERED that this closure order and order to seal file shall expire on its own force once the jury to be selected for the defendant’s capital murder trial has been impanelled and sequestered.
“IT IS FURTHER ORDERED that a full and complete record of all proceedings of any sort or nature whatsoever conducted under the closure order shall be kept and maintained and said record shall be made available to print and media [sic], provided a transcript is prepared by the court reporter, once defendant Wilson’s trial has commenced and the jury has been impanelled and sequestered.
[[Image here]]
“The Court does not take lightly this high duty cast upon it by the unique and compelling facts and circumstances of this case and the Court enters the extreme measures as set out in the foregoing order with full understanding and respect for the constitutional protection *426 of the press and the right of the press and the general public of access to criminal trials.”

Consolidated’s Petition

Consolidated petitions for a writ of mandamus to compel the circuit court to vacate its order, contending that the trial court’s order violates the public’s and the press’s right of access to criminal proceedings, guaranteed by the First Amendment to the United States Constitution.
A writ of mandamus is a drastic and extraordinary remedy. For this Court to issue such a writ, there must be (1) a clear legal right of the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the Court. Ex parte Adams, 514 So.2d 845 (Ala.1987). Accordingly, the burden of proof in regard to this mandamus petition is on Consolidated; however, as our discussion of United States Supreme Court cases will show, the burden is upon Wilson to justify the closure he seeks, provided that the right of access Consolidated claims attaches in this case.

United States Supreme Court Cases

In a variety of factual contexts, the United States Supreme Court has addressed the issue of the press’s and the public’s access to criminal proceedings. The most recent decision of that Court on the issue of the press’s and the public’s right of access, Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), which we refer to as Press-Enterprise II, is directly on point in this case, is comprehensible without explanation of other cases, and provides a specific method for analyzing the dispositive issues now before us; accordingly, we do not provide a detailed historical analysis of the progression of the cases involving the public’s and the press’s access to criminal proceedings. Instead, we generally refer the bench and bar to these cases to illustrate the development of the law in this area. See Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (“Press-Enterprise I”) (First Amendment right of access to juror voir dire); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (closure and right of access to criminal trials); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (closure and right of access to criminal trials); Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (closure and right of access to a suppression hearing); Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (common law right to copy and inspect public records and documents, including judicial records and documents).
Wilson argues, however, that Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) — and not Press-Enterprise II — provides the standards for analyzing this case. In Nebraska Press Association, the trial court, before the defendant’s trial for a murder that had attracted massive publicity, entered an order restraining the media from publishing confessions or admissions made by the defendant to law enforcement officers or to any third person. 427 U.S. at 544-45, 96 S.Ct. at 2795-96. Nebraska Press Association thus addressed an issue of prior restraint — i.e., a restriction on the media from publishing information in its possession. Id. at 563-70, 96 S.Ct. at 2804-08. The present case, however, addresses a restriction of access. Cf. Nebraska Press Association with Press-Enterprise II, Press-Enterprise I, Globe Newspaper Co., and Richmond Newspapers. See also, Philadelphia Newspapers, Inc. v. Jerome, 478 Pa. 484, 387 A.2d 425, 432-434 (1978) (analyzing the differences between prior restraint cases and right of access cases). Accordingly, we reject Wilson’s contention that Nebraska Press Association, instead of Press-Enterprise II, provides the standards by which to analyze this case.
In Press-Enterprise II, the United States Supreme Court wrote:
*427 “We granted certiorari to decide whether petitioner has a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution.
“I
“On December 23, 1981, the State of California filed a complaint in the Riverside County Municipal Court, charging Robert Diaz with 12 counts of murder and seeking the death penalty. The complaint alleged that Diaz, a nurse, murdered 12 patients by administering massive doses of the heart drug lidocaine. The preliminary hearing on the complaint commenced on July 6,1982. Diaz moved to exclude the public from the proceedings under Cal. Penal Code Ann. § 868 (West 1985), which requires such proceedings to be open unless ‘exclusion of the public is necessary in order to protect the defendant’s right to a fair and impartial trial.’ The Magistrate granted the unopposed motion, finding that closure was necessary because the case had attracted national publicity and ‘only one side may get reported in the media.’
“The preliminary hearing continued for 41 days. Most of the testimony and the evidence presented by the State was medical and scientific; the remainder consisted of testimony by personnel who worked with Diaz on the shifts when the 12 patients died. Diaz did not introduce any evidence, but his counsel subjected most of the witnesses to vigorous cross-examination. Diaz was held to answer on all charges. At the conclusion of the hearing, petitioner Press-Enterprise Company asked that the transcript of the proceedings be released. The Magistrate refused and sealed the record.
“On January 21,1983, the State moved in Superior Court to have the transcript of the preliminary hearing released to the public; petitioner later joined in support of the motion. Diaz opposed the motion, contending that release of the transcript would result in prejudicial pretrial publicity. The Superior Court found that the information in the transcript was ‘as factual as it could be,’ and that the facts were neither ‘inflammatory’ nor ‘exciting,’ but that there was, nonetheless, ‘a reasonable likelihood that release of all or any part of the transcripts might prejudice defendant’s right to a fair and impartial trial.’
“Petitioner then filed a peremptory writ of mandate with the Court of Appeal. ... [T]he Court of Appeal denied the writ of mandate.
“The California Supreme Court thereafter denied petitioner’s peremptory writ of mandate, holding that there is no general First Amendment right of access to preliminary hearings. The court reasoned that the right of access to criminal proceedings recognized in [Press-Enterprise I and Globe Newspaper Co.] extended only to actual criminal trials.
[[Image here]]
“It is important to identify precisely what the California Supreme Court decided:
“ ‘[W]e conclude that the magistrate shall close the preliminary hearing upon finding a reasonable likelihood of substantial prejudice which would impinge upon the right to a fair trial. Penal code section 868 makes clear that the primary right is the right to a fair trial and that the public’s right of access must give way when there is conflict.’ [Press-Enterprise Co. v. Superior Court of Riverside County] 37 Cal.3d [772], at 781, 209 Cal.Rptr. [360], at 366, 691 P.2d [1026], at 1032 [(1984)].
“It is difficult to disagree in the abstract with that court’s analysis balancing the defendant’s right to a fair trial against the public right of access. It is also important to remember that these interests are not necessarily inconsistent. Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers.
“The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness....
*428 "... The California Supreme Court concluded that the First Amendment was not implicated because the proceeding was not a criminal trial, but a preliminary hearing. However, the First Amendment question cannot be resolved solely on the label we give the event, i.e., ‘trial’ or otherwise, particularly where the preliminary hearing functions much like a full-scale trial.
“In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a ‘ “tradition of accessibility implies the favorable judgment of experiences,” ’ [citations omitted], we have considered whether the place and process have historically been open to the press and general public.
“In Press-Enterprise I, for example, we observed that ‘since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown.’ ...
“Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.[1] Globe Newspaper, supra, 457 U.S., at 606, 102 S.Ct., at 2619. Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that ‘the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.’ Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218, 99 S.Ct. 1667, 1672, 60 L.Ed.2d 156 (1979). Other proceedings plainly require public access. In Press-Enterprise I, we summarized the holdings of prior cases, noting that openness in criminal trials, including the selection of jurors, ‘enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.’ 464 U.S., at 501, 104 S.Ct., at 820.
“These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. Globe Newspaper Co. v. Superior Court, supra, 457 U.S., at 606, 102 S.Ct., at 2619. While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity. In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access. In Press-Enterprise I we stated:
“ ‘[T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.’ 464 U.S., at 510, 104 S.Ct., at 824.”
478 U.S. at 3-10, 106 S.Ct. at 2737-41. (Emphasis added.)

Analysis

Given the foregoing, we must first determine whether the First Amendment right of public access that Press-Enterprise II describes attaches in this case. Id. at 9, 106 S.Ct. at 2740. To make that determination, we must make a twofold determination of whether the place and process have historically been open to the *429 press and the general public and whether public access plays a (particularly) significant positive role in the functioning of the process in question. Id. at 8, 106 S.Ct. at 2740.
These determinations are complicated in this case considerably by the trial court’s blanket closure of all “pretrial hearings” until the jury is selected. At oral argument, the parties stated that the closure of “pretrial hearings” primarily affected suppression hearings, but the order encompasses all “pretrial hearings.” (We do not read the order as closure of juror voir dire, in derogation of Press-Enterprise I.) Also, the trial court sealed the court file until the jury was selected, so we must address not only the closure of the “pretrial hearings” but also the closure of the court file.
We first address whether pretrial hearings have been conducted in a place and are a process that have historically been open to the press and the general public, mindful that “the First Amendment question cannot be resolved solely on the label we give the event, trial or otherwise.” Press-Enterprise II, at 7, 106 S.Ct. at 2740. In State v. Williams, 93 N.J. 39, 459 A.2d 641 (1983), the New Jersey Supreme Court held that the First Amendment to the United States Constitution provided the public and press a “protectible constitutional interest in access to all pretrial proceedings in the prosecution of a criminal case,” 93 N.J. at 48, 51-57, 459 A.2d at 645, 647-50. (Emphasis added.) In arriving at that conclusion, the New Jersey Supreme Court determined that “the near uniform practice in the federal and state court systems has been to conduct pretrial criminal proceedings in open court,” 93 N.J. at 55, 459 A.2d at 649, and that court provided perhaps the most impressive and comprehensive citation of authority for that proposition yet assembled.[2]
Not all pretrial hearings have a historical counterpart. As to those pretrial hearings that have no historical counterpart, courts, in addressing the issue of access, have focused on the importance of the hearings to the case, in an analysis similar to the *430 Press-Enterprise II standard of whether public access plays a (particularly) significant positive role in the functioning of the process. For example, in Minneapolis Star & Tribune Co. v. Kammeyer, 341 N.W.2d 550 (Minn.1983), the Minnesota Supreme Court, in holding that under the First Amendment “the public does have a right of access to [all] pretrial proceedings in criminal cases,” 341 N.W.2d at 556, stated:
“The lack of a tradition of public access to pretrial proceedings should not necessarily be counted against [the press]. Many modem pretrial procedures, such as the motion to suppress in this case, have no historical counterpart. These proceedings are often critical, sometimes decisive, to the outcome in a criminal prosecution.”
Id. at 555. For further discussion of this point see Iowa Freedom of Information Council v. Wifvat, 328 N.W.2d 920 (Iowa 1983), and Richmond Newspapers, Inc. v. Commonwealth, 222 Va. 574, 281 S.E.2d 915, 922 (1981).
That there is little English common law history for many present pretrial hearings and that much of the history concerning pretrial hearings is relatively recent are explained by Chief Justice Burger in Gannett:
“[W]hen the Sixth Amendment was written, and for more than a century after that, no one could have conceived that the exclusionary rule and pretrial motions to suppress evidence would be part of our criminal jurisprudence.”
443 U.S. at 395-96, 99 S.Ct. at 2913 (Burger, C.J., concurring).
Much has been written on the issue of the positive role that public access plays in the actual functioning of pretrial hearings, and to aid us in our analysis, we consider the writings of other courts.
To begin, other courts have noted that publicity concerning pretrial proceedings differs in some respects from publicity concerning the actual trial. For example, in Minneapolis Star & Tribune Co., the Supreme Court of Minnesota wrote:
“In the case of pretrial proceedings, publicity has a far greater potential for prejudicing defendants than it does at the time of trial. This is because safeguards which can be applied at the trial stage, such as sequestration of witnesses and jurors, have no counterpart at the pretrial stage of a criminal proceeding.”
341 N.W.2d at 556.
On the same subject, in Ashland Publishing Co. v. Asbury, 612 S.W.2d 749 (Ky.App.1980), the court wrote:
“The problems faced by the courts in insuring fair trials are much different when deciding whether a trial itself should be closed than when deciding whether pretrial proceedings should be closed. Since juries can be sequestered, it would be a ‘rare occasion’ indeed when a trial should be closed. On the other hand, sequestration is no remedy at all to prevent the circulation throughout a community or even the state at large of prejudicial information from a pretrial proceeding. We do not mean to imply that every criminal case is a cause céle-bre; it obviously is not. The danger to a fair trial from pretrial publicity becomes acute only in those cases which excite widespread public attention, or are very likely to do so, and it is these cases which present the problem to the courts.
“The very purpose of a suppression hearing, for example, is to prevent jurors from considering inadmissible prejudicial evidence. This purpose would likely be frustrated if the prejudicial information were known to some or all of the members of a jury panel before the trial even began....”
612 S.W.2d at 752.
Although both those courts acknowledged that pretrial publicity has a far greater potential for prejudicing a defendant’s fair trial rights than does publicity at trial, both nevertheless held that a right of access to the pretrial hearing existed. Minneapolis Star & Tribune Co., at 556; Ashland Publishing Co., at 752.
The Supreme Court of Hawaii in Gannett Pacific Corp. v. Richardson, 59 Haw. 224, 580 P.2d 49 (1978), a case involving the *431 closure of a preliminary hearing, provided an excellent discussion of the value of open proceedings:
“The role played by the news media in this area is unique and highly significant — for so long as it acts responsibly, the media is definitely a positive force in the fair and impartial administration of justice.
“ ‘[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press, most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.’ Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 491-492 [95 S.Ct. 1029, 1044-1045, 43 L.Ed.2d 328]. ...
[[Image here]]
“The reasons underlying the policy of open and public administration of justice are clear and compelling. Because of our natural suspicion and traditional aversion as a people to secret proceedings, suggestions of unfairness, discrimination, undue leniency, favoritism, and incompetence are more easily entertained when access by the public to judicial proceedings are unduly restricted. ‘Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges....’ Nebraska Press Assn. v. Stuart, supra, 427 U.S. [539] at 587, 96 S.Ct. [2791] at 2816 [49 L.Ed.2d 683] [(1976)] (Brennan, J., concurring). Thus, the openness which serves as a safeguard against attempts to employ our courts as instruments of persecution also serves to enhance public trust and confidence in the integrity of the judicial process. Such trust and confidence is a vital ingredient in the administration of justice under our system of jurisprudence. The efficiency, competence, and fairness of our judicial system are matters of legitimate interest and concern to our citizenry, and free access to our courtrooms is essential to their proper understanding of the nature and quality of the judicial process.”
59 Haw. at 229-230, 580 P.2d at 54-55.
Directly on point in our discussion, the Supreme Court of New Jersey in State v. Williams wrote:
“The question posed by the present appeals is whether this analysis of the ‘institutional value’ of open criminal trials applies with equal force to criminal pretrial proceedings. We believe that it does and conclude therefore that the First Amendment embraces a public right of access to such pretrial proceedings.
“The pretrial aspects of criminal prosecutions have become increasingly important in the modern administration of criminal justice. See Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (counsel must be provided in all pretrial proceedings that are critical in the criminal prosecution). Court decisions protecting the constitutional rights of defendants have given rise to new pretrial proceedings that frequently have a major effect on the outcome of a prosecution. E.g., United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Miranda v. Arizona, 384 U.S. 436, 438, 86 S.Ct. 1602, 1609, 16 L.Ed.2d 694 (1966); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); State v. Driver, 38 N.J. 255, 183 A.2d 655 (1962). As a result of these developments, proceedings in advance of trial are now of central importance in our system of criminal *432 adjudication. United States v. Criden, 675 F.2d 550, 55-57 (3 Cir.1982); see Gannett, supra, 443 U.S. at 397 n. 1, 99 S.Ct. at 2914 n. 1, 61 L.Ed.2d at 632 n. 1 (Powell, J., concurring); id. at 434-39, 99 S.Ct. at 2933-36, 61 L.Ed.2d at 655-59 (Blackmun, J., concurring in part and dissenting in part).
“These are, we are satisfied, important institutional values that are served by opening criminal pretrial proceedings to the public. In view of the heightened role of the pretrial phases of a criminal prosecution, the closure of pretrial proceedings, as the closure of the trial itself, can naturally detract from 'the functioning of the judicial process and the government as a whole.’ Globe Newspaper [Co. v. Superior Court ] supra, [457] U.S. at [607], 102 S.Ct. at 2620, 73 L.Ed.2d at 256 [(1982)]. Conducting pretrial criminal proceedings in an atmosphere of secrecy is offensive to the general public and undermines the public trust essential to an effective judicial system. Exclusion of the public compromises the appearance of fairness because ‘secret hearings — though they be scrupulously fair in reality — are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court’s decision sealed from public view.’ Gannett, supra, 443 U.S. at 429, 99 S.Ct. at 652-53 (Blackmun, J., concurring in part and dissenting in part) (quoting United States v. Cianfrani, 573 F.2d 835, 851 (3 Cir.1978)). In addition to kindling public misperception and eroding public confidence, closure of significant pretrial proceedings perpetuates general ignorance and cuts off public knowledge necessary to a full understanding of the criminal justice system. See Gannett, supra, 443 U.S. at 428-29, 99 S.Ct. at 2830-31, 61 L.Ed.2d at 652. Conversely, the openness of pretrial hearings in criminal causes fosters an informed public ‘discussion of governmental affairs.’ Globe Newspaper, supra, [457] U.S. at [605], 102 S.Ct. at 2619, 73 L.Ed.2d at 155-56; see State v. Allen, [73 N.J. 132, at 155-56, 373 A.2d 377] [at 388-89 (1977) ] (Pashman, J., concurring). Open proceedings contribute to the public’s knowledge and encourage a general appreciation of the administration of criminal justice. Consequently, real benefits redound to the judiciary as a governmental institution — the judicial function itself is enhanced — by providing public access to criminal pretrial proceedings.”
93 N.J. at 53-55, 459 A.2d at 648-49.
For further discussion, see Richmond Newspapers, Inc., and Arkansas Television Co. v. Tedder, 281 Ark. 152, 662 S.W.2d 174 (1983).
Furthermore, as the court in Westchester Rockland Newspapers, Inc. v. Legett, 48 N.Y.2d 430, 423 N.Y.S.2d 630, 636, 399 N.E.2d 518, 523 (1979), points out, a large portion of the prosecution of most criminal cases is done in pretrial proceedings; if the public and the press were excluded from such proceedings — or have no right of access to them — then it is possible that a large portion of the work of criminal courts would be “behind closed doors.”
We note that other courts have resolved the issues concerning the public’s and the press’s right of access in the following ways. Some courts have held that without regard to any state constitutional provision the First Amendment carries a right of access. Arkansas Television Co. (holding that the First Amendment provides a right of access to “pretrial proceedings”); Minneapolis Star & Tribune Co. (holding that the First Amendment provides the public a “right of access to pretrial proceedings in criminal cases”); United States v. Brooklier, 685 F.2d 1162 (9th Cir.1982) (holding that the First Amendment provides a right of access to suppression hearings, at least). Some courts have held that the First Amendment, as well as their own state constitutions, provided a right of access. Kearns-Tribune Corp. v. Lewis, 685 P.2d 515 (Utah 1984) (First Amendment provides right of access “to preliminary hearings in criminal cases”); State v. Williams (holding that First Amendment provides a right *433 of access to “all pretrial proceedings”); Richmond Newspapers, Inc. (holding that First Amendment provides right of access to suppression hearings). Finally, some courts have held that a right of access exists under their state constitutions. Iowa Freedom of Information Council; Ashland Publishing Co.; Great Falls Tribune v. District Court, 186 Mont. 433, 608 P.2d 116 (1980). For further discussion, see United States v. Criden, 675 F.2d 550 (3d Cir.1982); United States v. Edwards, 430 A.2d 1321 (D.C.App.1981). Cf. Miami Herald Publishing Co. v. Lewis, 426 So.2d 1 (Fla.1982).
Considering our discussion, we hold that the qualified First Amendment right of access to criminal proceedings described in Press-Enterprise II applies to pretrial hearings. Press-Enterprise II; State v. Williams; Arkansas Television Co.; Minneapolis Star & Tribune Co.[3]
As to the court file, the analysis is much simpler. First, the United States Supreme Court in Nixon v. Warner Communications, supra, as much as said that judicial records and documents have historically been open to the press and public:
“It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, see, e.g., Browne v. Cumming, 10 B. & C. 70, 109 Eng.Rep. 377 (K.B. 1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit....
“It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not ‘used to gratify private spite or promote public scandal’ through the publication of ‘the painful and sometimes disgusting details of a divorce case.’ In re Caswell, 18 R.I. 835, 836, 29 A. 259 (1893)....
“It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. • The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court....”
435 U.S. at 597-99, 98 S.Ct. at 1311-13. The same considerations as to the positive role in the functioning of the process that we discussed earlier apply as to the court file. We conclude, therefore, that the qualified First Amendment right of access to criminal proceedings applies to the court file. Press-Enterprise II; State v. Williams; Arkansas Television Co.; Minneapolis Star & Tribune Co.
Because the qualified First Amendment right of access attaches to the pretrial hearings and the court file, they cannot be closed unless the court makes specific, on-the-record findings demonstrating that closure is essential to preserve higher values and the closure order is narrowly tailored to serve those interests. Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. at 2742-43. Wilson asserts that his fair trial rights will be violated unless the order stands. To prevail, Wilson must present evidence that will support specific findings that there is a substantial probability that his right to a fair trial will be prejudiced by publicity that closure would prevent and that reasonable alternatives to closure cannot adequately protect his fair trial rights. Press-Enterprise II, at 14, 106 S.Ct. at 2743; Press-Enterprise I; Richmond Newspapers.
First, Wilson, who is a member of a racial minority, presented evidence consisting of editorial cartoons and comments *434 from the Daily Home. In substance, this evidence indicates a negative stance toward minority groups, convicted criminals, and persons whose viewpoint some might label as “liberal.”
Second, Wilson presented evidence of Daily Home articles specifically concerning him and the crime of which he is accused. These articles consisted of reports of the murder investigation, reports of his arrest and indictment; detailed coverage of his trial, conviction, and sentencing; coverage of post trial motions; and an article on this Court’s reversal of that conviction. In addition, Wilson produced an editorial cartoon from the Daily Home that depicted him as a “recipient of revolving door justice,” and with a caption indicating that he had been sentenced to 15 years for rape in 1981, that he had been released in 1984, and that he had been convicted in 1986 for rápe, sexual abuse, and capital murder.
Finally, at his hearing on the closure motion, Wilson produced evidence that the Daily Home had identified both his attorneys and himself by name and race, the identification by race serving no apparent race-neutral motive. Counsel for Wilson argued in the closure hearing that this case is racially sensitive.
The news editor for the Daily Home testified, with regard to information disclosed at pretrial hearings, that “[i]f it’s available and we can use it, then we do.”
We reiterate that the questions before us are whether, consistent with the decisions of the United States Supreme Court, there is a substantial probability that Wilson’s right to a fair trial would be prejudiced by publicity that the closure would prevent and whether reasonable alternatives to the closure can adequately protect his fair-trial rights.
Thus, the issue to be resolved relates to the sufficiency of the evidence of publicity produced by Wilson in support of a very broad closure order. The content of the publicity is a factor in our determination.[4]
The generalized editorial comments do not specifically indicate that it was substantially probable that Wilson’s fair trial rights would be prejudiced, nor does the evidence relating to publicity about Wilson show that it is “substantially probable” that his right to a fair trial would be prejudiced in such a way as to require this closure order.
Based on the evidence, we conclude that the closure order in question is not “narrowly tailored” to protect Wilson’s fair-trial interest. Although the trial court made the order subject to continuing review, the order closed all pretrial hearings and the court file. Neither the evidence presented by Wilson nor the trial court’s findings indicate that such a broad order was required to protect Wilson’s fair-trial interest. The order cannot be sustained under Press-Enterprise I or Press-Enterprise II.
Based on the foregoing, the petition for the writ of mandamus is due to be granted.
WRIT GRANTED.
MADDOX,* SHORES, STEAGALL, KENNEDY and INGRAM, JJ., concur.
ADAMS, J., dissents.

. Later in the opinion, the United States Supreme Court stated this standard as whether public access "plays a particularly significant role in the actual functioning of the process." 478 U.S. at 11, 106 S.Ct. at 2742. (Emphasis added.)

. In footnote 5 at 93 N.J. at 55, 459 A.2d at 649-50, the Williams court wrote the following to support the proposition that "the near uniform practice in the federal and state court systems has heen to conduct pretrial criminal proceedings in open court”:
"Jurisdictions have expressed their practices in several fashions, including statute, e.g., Ark.Stat.Ann. § 22-109 (Repl.1962); Cal. Penal Code § 868 (West 1982); Ga.Code Ann. § 2-111 (1977); Ind.Code Ann. § 35-1.1-2-1 (West 1977); Mich.Stat.Ann. § 27A.1420 [M.C.L.A. § 600.1420] (Callaghan 1980); Nev. Rev.Stat. § 171.204 (1979); N.Y.Jud.Law § 4 (McKinney 1983); Wis.Stat.Ann. § 757.14 (West 1981); court rule, e.g., R. 1:2-1 (N.J.): Pa.R.Crim.P. 323(f) (suppression hearings); and decisional law construing constitutional or statutory provisions, e.g., Sacramento Bee v. United States District Court, 656 F.2d 477 (9 Cir.1981), cert, den., 456 U.S. 983, 102 S.Ct., 2257, 72 L.Ed.2d 861 (1982); United States v. Brooklier, 685 F.2d 1162 (9 Cir.1982); Phoenix Newspapers, Inc. v. Jennings, 107 Ariz. 557, 490 P.2d 563 (Ariz.1971); Shiras v. Britt, 267 Ark. 97, 589 S.W.2d 18 (Ark.1980); Star Journal Pub. Corp. v. County Court, 197 Colo. 234, 591 P.2d 1028 (Colo. 1978); State v. Burak, 37 Conn.Sup. 627 431 A.2d 1246 (Conn.Sup. 1981); United States v. Edwards, 430 A.2d 1321 (D.C.App.1981); Miami Herald Pub. Co. v. Lewis, 383 So.2d 236 (Fla.App. 1980); R.W. Page Corp. v. Lumpkin, 249 Ga. 576, 292 S.E.2d 815 (Ga.1982); Gannett Pacific Corp. v. Richardson, 59 Hawaii 224, 580 P.2d 49 (Hawaii 1978); State v. Porter Superior Court [274 Ind. 408], 412 N.E.2d 748 (Ind.1981); Ashland Publications Co. v. Asbury, 612 S.W.2d 749 (Ky.App.1980); Patuxent Pub. Corp. v. State, 48 Md.App. 689, 429 A.2d 554 (Md.Sp.App. 1981); Keene Pub. Corp. v. Cheshire County Superior Court, 119 N.H. 710, 406 A.2d 137 (N.H.1979); Westchester Rockland Newspapers v. Leggett, 48 N.Y.2d 430, 399 N.E.2d 518, 423 N.Y.S.2d 630 (N.Y.1979); State ex rel. Dayton Newspapers, Inc. v. Phillips, 46 Ohio St.2d 457, 351 N.E.2d 127 (Ohio 1976); Commonwealth v. Hayes, 489 Pa. 419, 414 A.2d 318 (Pa. 1980); Rapid City Journal v. Circuit Court, 283 N.W.2d 563 (S.D.1979); Herald Ass’n Inc. v. Ellison, 138 Vt. 529, 419 A.2d 323 (Vt.1980): Richmond Newspapers v. Virginia, 222 Va. 574, 281 S.E.2d 915 (Va.1981): Federated Publications v. Kurtz, 94 Wash.2d 51, 615 P.2d 440 (Wash.1980); State ex rel. Herald Mail Co. v. Hamilton [165 W.Va. 103], 267 S.E.2d 544 (W.Va.1980); Williams v. Stafford, 589 P.2d 322 (Wyo.1979); see also Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the ‘Free Press-Free Trial’ Issue, 87 F.R.D. 519 (1980); American Bar Association ‘Standards Relating to the Administration of Criminal Justice: Fair Trial and Free Press,’ Standard 8-3.2 (2d ed. 1980).”

. Wilson himself concedes "there is a limited First Amendment right to attend pretrial hearings in the courtroom.” See Resp. Brief at 12.

. In saying this, we note that we are sensitive to incidents of disparate treatment of racial minority group members, but emphasize that the First Amendment strictly forbids us from acting as arbiters of the correctness of the Daily Home ⅛ political stance and, therefore, we cannot and do not so act in this case. Rather, as stated, the content of the publicity is addressed only as a factor in deciding whether Wilson’s rights will be prejudiced absent this particular closure order.